[No. S047833. Dec. 9, 1996.]

THE PEOPLE ex rel. DANIEL E. LUNGREN, as Attorney General, etc., Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent;
AMERICAN STANDARD, INC., et al., Real Parties in Interest.

**COUNSEL**

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Theodora P. Berger, Assistant Attorney General, Craig C. Thompson and Edward G. Weil, Deputy Attorneys General, for Petitioner.

Roger Beers, Gregory D. Totten, Edwin F. Lowry, David Roe, Catherine M. Steane, Albert H. Meyerhoff, James R. Wheaton, Hannah Bentley, Alice Chang Kaufman, Christine A. Mailloux, Altshuler, Berzon, Nussbaum, Berzon & Rubin, Fred H. Altshuler, Mary Lynne Werlwas, Milberg, Weiss, Bershad, Hynes & Lerach, William S. Lerach, Alan M. Mansfield, Frank J. Janecek, Jr., Timothy G. Blood, Bushnell, Caplan & Fielding, Alan M. Caplan, Philip Neumark and April M. Strauss as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Landels, Ripley & Diamond, Raymond F. Lynch, Mary J. Decker, Pillsbury, Madison & Sutro, Patrick C. Marshall, Munger, Tolles & Olson, Patrick J. Cafferty, McCutchen, Doyle, Brown & Enersen, Pecos Bill Field, Burditt & Radzius, Richard O. Wood, Leslie Krasny, Morrison & Foerster, Michele B. Corash, Robin M. Shapiro, Robert L. Falk, Beveridge & Diamond, James L. Meeder, Robert D. Wyatt, Wilson, Elser, Moskowitz, Edelman & Dicker, Gary Tavetian, L. Victor Bilger, Jr., Katten, Muchin, Zavis & Weitzman and David M. Bass for Real Parties in Interest.

Pappy & Davis, George A. Pappy, Christopher M. Micheli, Fred L. Main, Keck, Mahin & Cate, Michael J. Van Zandt, Stephen M. Levine, William G. Ives, Robin Grover, Morrison & Foerster, Seth Hufstedler and Shirley M. Hufstedler as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

MOSK, J.—The Safe Drinking Water and Toxic Enforcement Act of 1986 (Health & Saf. Code, §§ 25249.5-25249.13),[1] adopted by the people at the November 4, 1986, General Election as Proposition 65 (hereinafter referred to as the Act or Proposition 65), provides in material part that "[n]o person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water . . . ." (§ 25249.5.) This case requires us to define what is meant by the phrase "source of drinking water." The Attorney General, who brought this action to enforce the Act, contends that the phrase includes the water that is stored in or run through water faucets, and so defendant faucet manufacturers, whose products allegedly leach toxic chemicals into drinking water, may be sued for violations of the Act. The faucet manufacturers contend the contrary.

---

[1]All statutory references are to this code, unless otherwise indicated.

We conclude that, in light of both the Act's language and its purpose, the Attorney General is correct in construing it to prohibit the discharge of toxic chemicals into faucet water.[2]

## I. Statement of Facts and Procedural History

The Attorney General filed an action in superior court seeking injunctive relief and civil penalties against defendants, 16 manufacturers and distributors of drinking water faucets sold and used in California. The Attorney General alleged that the faucets they manufactured contained significant quantities of lead, which is among the substances listed by the state as known to cause cancer and reproductive toxicity within the meaning of the Act. (See § 25249.8; Cal. Code Regs., tit. 22, § 12000, subds. (b), (c).) The Attorney General further alleged that "[w]hen residential tapwater is stored in defendants' faucets, lead is leached from the inside surface of the faucets into the drinking water. When tapwater is drawn from defendants' faucets, lead is ingested by any person who ingests drinking water . . . ." He also alleged that "[T]he fact that lead leaches from faucets into tapwater has been known for a number of years." Defendants have thereby violated section 25249.5 according to the Attorney General.

Defendants demurred to the first and second causes of action,[3] arguing that faucet water was not a "source of drinking water" within the meaning of the statute and that the Attorney General had therefore failed to allege facts constituting a cause of action. The trial court sustained the demurrer to the first two causes of action, determining that "residential water faucets and the water within them are not 'sources of drinking water.'" Although the trial court sustained the demurrer with leave to amend, the Attorney General concluded it was not possible to amend the complaint within the constraints of the trial court's order. He instead sought a writ of mandate from the Court

---

[2]We use the term "faucet water" because other commonly available terms are not precise enough for purposes of this case. The term is intended to refer only to water stored in or channeled through faucets prior to coming out of the tap. The phrase "tap water," which is the one most often used by the parties, connotes water both immediately before and after it comes out of a faucet or tap. (See Webster's Third New Internat. Dict. (3d ed. 1961) p. 2340.) Because this case concerns only water *before* it comes out of the tap, we have coined the term "faucet water" to refer exclusively to such water.

[3]The first cause of action alleges violations of the discharge prohibition of section 25249.5; the second alleges violations of the Unfair Competition Act (Bus. & Prof. Code, § 17200 et seq.) based on violations of the discharge prohibition. The third cause of action alleges violations of section 25249.6, the second of the two major operative provisions of the Act, which prohibits businesses from exposing individuals to toxic chemicals without a warning. The fourth and last cause of action alleges violations of the Unfair Competition Act based on violations of the warning requirement referred to in the third cause of action. Defendants did not demur to the "failure to warn" causes of action, and these are not at issue before this court.

of Appeal. The Court of Appeal denied relief, concluding, for reasons discussed at greater length below, that the language of the statute could not support the Attorney General's view that the water within household faucets is a "source of drinking water." It further reasoned that, inasmuch as that term was ambiguous, the ambiguity should be resolved in favor of the defendants, since violators of the Act may be subject to civil penalties of up to $2,500 per day for each violation (see § 25249.7, subd. (b)), and "penal" statutes are traditionally construed strictly in favor of the defendant. We granted review to determine the proper construction of the phrase "source of drinking water."[4]

In the time since we granted review, the Attorney General has entered into a settlement agreement, which provided for the dismissal of all defendants. Most of these settlements provide, among other things, that defendants will eventually sell in California only those faucets that leach lead below maximum levels set pursuant to the Act, and that compliance will be phased in over specified time periods. In the interim, warnings to consumers will be provided for those faucets that do not comply with the Act. The settlement with defendants Kohler and Sterling Plumbing Inc. (hereafter collectively Kohler), however, provides that Kohler will reduce lead content to levels that comply with the Act in 95 percent of its kitchen faucets by December 31, 1999, but that the companies will achieve 100 percent compliance if we decide this case in the Attorney General's favor.

After conclusion of the settlement agreement Kohler filed a motion to dismiss, claiming that the issue was moot and without further legal importance. But as Kohler conceded, there are an undetermined number of other faucet manufacturers and plumbing suppliers which may yet be affected by our decision. Because of the continuing legal importance of the questions on which we granted review, as well as the contingent nature of some of the settlements entered into by the parties, we denied the motion to dismiss. (See *State of Cal.* ex rel. *State Lands Com.* v. *Superior Court* (1995) 11 Cal.4th 50, 60-62 [44 Cal.Rptr.2d 399, 900 P.2d 648].)

## II. DOES "SOURCE OF DRINKING WATER" INCLUDE FAUCET WATER?

■ "Our only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action. Accordingly we assume that the complaint's properly pleaded material allegations are true and give the complaint a reasonable interpretation by reading it as a whole and all its parts in their context. [Citations.] We do not, however, assume the truth of

---

[4]We also granted review on the collateral issue of whether the Act is a "penal" statute that should be strictly construed.

contentions, deductions, or conclusions of fact or law." (*Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903].) In the present case there is no dispute that lead is a carcinogenic and reproductively toxic chemical within the meaning of the Act. (See Cal. Code Regs., tit. 22, § 12000, subds. (b), (c).) The sole question the parties raise is the proper construction of section 25249.5, specifically the meaning of the term "source of drinking water," and whether it includes household faucets and faucet water.

We begin our inquiry into the meaning of the phrase "source of drinking water" with an examination of the language of the Act itself. "Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." (*Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 543 [277 Cal.Rptr. 1, 802 P.2d 317].) Of course, in construing the statute, "[t]he words . . . must be read in context, considering the nature and purpose of the statutory enactment." (*Nahrstedt* v. *Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 378-379 [33 Cal.Rptr.2d 63, 878 P.2d 1275].)

 The Act defines "source of drinking water" at section 25249.11, subdivision (d), as follows: " 'Source of drinking water' means either a present source of drinking water or water which is identified or designated in a water quality control plan adopted by a regional board as being suitable for domestic or municipal uses." Though this language does not fully resolve the issue before us, it does do much to illuminate the meaning of the phrase.

The latter part of the definition is reasonably clear. It refers to regional water quality control plans, which are required under the Porter-Cologne Water Quality Control Act. (Wat. Code, § 13000 et seq. (Porter-Cologne Act).) Pursuant to the Porter-Cologne Act, the state is divided into nine regions. (*Id.*, § 13200.) Each region has a regional water quality control board responsible for formulating and implementing a plan to promote the quality of the bodies of water within its jurisdiction. (*Id.*, § 13241.) As part of the regional water quality control plans, the boards must designate the various "beneficial uses" of each body of water, including "domestic, municipal, agricultural, and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves." (*Id.*, § 13050, subd. (f); *id.*, subd. (j).) The regional water quality control board's jurisdiction encompasses both natural lakes, rivers and creeks and other bodies of water, as well as artificially created bodies such as reservoirs, canals, and dams. (See

*id.* § 13050, subd. (e) ["waters of the state" subject to water quality control plan "means any surface water or groundwater within the boundaries of the state"]; see also, e.g., California Water Quality Control Board, Central Valley Region, Central Regional Water Quality Control Plan (Basin Plan) for the Sacramento River Basin and the San Joaquin River Basin (3d ed. 1994) table II-1 (hereafter Central Regional Water Quality Control Plan). According to the plain language of section 25249.11, subdivision (d), therefore, waters of all types that are considered "suitable" for "domestic" or "municipal" use in these regional water quality control plans are "sources of drinking water" within the meaning of the Act. It is undisputed that regional water quality control districts do not regulate faucet water and that faucet water is not found in a water quality control plan.

Section 25249.11, subdivision (d), does not further define the first part of its definition, the term "present source of drinking water," which is also considered a "source of drinking water" within the meaning of the Act. But two reasonable inferences can be made about the meaning of that phrase. First, since it is used in the alternative with "water which is identified . . . in a water quality control plan . . . as being suitable for domestic or municipal uses," it is presumably something other than the water sources referred to in this latter part of the definition. (*Ibid.*) ▇ Statutes, whether enacted by the people or the Legislature, will be construed so as to eliminate surplusage. (See *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798-799 [268 Cal.Rptr. 753, 789 P.2d 934].) ▇ Second, because the term is not further defined, it can be assumed to refer not to any special term of art, but rather to a meaning that would be commonly understood by the electorate.

Turning to the dictionary, we observe that the word "source" has several related but distinct meanings. One such meaning is "the point of origin of a stream of water." (Webster's Third New Internat. Dict., *supra*, p. 2177.) The dictionary uses by way of example the following: "followed it from its source high in the mountains to its calmer reaches." (*Ibid.*) *This* is the meaning of "source" that defendants assert is intended by the Act, that is, the *ultimate* origin of drinking water. At first blush, that assertion may appear credible, because this definition refers specifically to a source of *water.* On further reflection, however, this definition cannot be the sole and exclusive meaning of that term because, as even defendants concede, the term "source of drinking water" includes all waters suitable for municipal or domestic use in a regional water quality control plan, including reservoirs, channels, and bodies of water in urban areas. Accordingly, the term "source of drinking water" cannot be taken to mean the ultimate origins of drinking water in this narrow sense.

Another definition of "source" is "a point of origin or procurement." (Webster's Third New Internat. Dict., *supra*, p. 2177.) Yet another possible

meaning of "source" is "point of emanation," as in "it is desirable to have the light source accurately located." (*Ibid.*) Faucets and faucet water can reasonably be understood to be a "source" of drinking water in this sense, i.e., the point of procurement or emanation of drinking water. The Attorney General argues that these meanings are also included within the term "source of drinking water."

Defendants insist, and the Court of Appeal held, that the electorate could not have understood the phrase in the manner urged by the Attorney General, and that it must have signified to them a more remote source. But they advance no persuasive reason why the above quoted alternate definitions of the word "source" could not have been incorporated into the Act. Indeed, the very fact that the phrase "remote source" is not a redundancy, nor "immediate source" an oxymoron, calls defendants' position into question. The comprehensiveness of the definition of "source of drinking water" in section 25249.11, subdivision (d), which covers all "present" sources, as well as waters "suitable" as drinking water sources, suggests that the drafters of the Act, and the electorate that adopted it, had both immediate and remote sources in mind.

Defendants contend, and the Court of Appeal concluded, that the Attorney General's interpretation of "source of drinking water" would excise the word "source" from the Act, because faucet water is not a source of drinking water but rather is simply drinking water. On the contrary, the Attorney General quite reasonably argues that a "source of drinking water" is any water that is part of the water supply and delivery system prior to coming out of the tap, from the mountain stream to the faucet, whereas "drinking water" is water after it comes out of the tap and is in the consumer's possession. Thus, as the Attorney General concedes, the leaching of toxic chemicals into water once it has been drawn from the tap, as from glasses or cups, would not be considered a discharge into a "source of drinking water" under section 25249.5.[5]

Defendants also contend that clues as to the meaning of "source of drinking water" can be derived from use of the term "release" in section 25249.5, because that term "has been consistently defined to refer to events

---

[5]Such glasses or cups would, however, be governed by the warning provisions of the Act found in section 25249.6.

The Attorney General also contends that faucets and pipes are subject to these warning provisions. Contrary to the conclusion of the Court of Appeal, there is no reason in the language or purpose of the Act why a business that manufactures plumbing fixtures cannot be both "discharging" toxic chemicals into a drinking water source in violation of section 25249.5, and also "exposing" persons to toxic chemicals so as to trigger section 25249.6's warning requirements.

in the outside environment." The statutes they cite do not support their position. For example, section 25501, subdivision (r), the hazardous materials law, defines "release" as any "spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, *leaching*, dumping, or disposing into the environment." (*Id.*, subd. (r), italics added.) Section 25249.5, on the other hand, pertains to the "release," including presumably "leaching," of toxic chemicals into water or into or onto land when such chemical passes or probably will pass into a "source of drinking water," rather than into the "environment." Section 25501, subdivision (r), in other words, does not support the assertion that the term "release" limits the meaning of "source of drinking water" in the manner advocated by defendants; it *does* underscore that "release" includes "leaching."

Defendants argue as well that the fact the statute specifies a prohibition of release of toxic chemicals "*into water or into or onto land* where such chemical passes or probably will pass into a source of drinking water" must exclude faucet water, since the toxic contamination of faucet water comes directly from lead pipes, not from water or land, and the statute would thereby be rendered irrational. Yet it is evident that the phrase "into water" in the first part of section 25249.5 refers both to drinking water sources themselves and to "nonsource" water that will convey toxic chemicals into a source of drinking water. Thus, for example, a discharge directly into a drinking water reservoir—clearly a drinking water source—would be considered a discharge "into water . . . where such chemical passes . . . into a source of drinking water." (*Ibid.*) So too, there is nothing illogical about reading the statute to conclude that lead pipe contamination of faucet water is also a prohibited release of a toxic chemical directly into a "source of drinking water."

The Attorney General and defendants also disagree about whether defendants' interpretation of the phrase "present source of drinking water" creates surplusage. As noted, the phrase "present source of drinking water" must be interpreted to refer to something other than the "water . . . designated in a water quality control plan . . . as being suitable for domestic or municipal uses." (§ 25249.11, subd. (d).) Defendants argue that the distinction between the two prongs of the definitions "is only *temporal*—the first addresses those bodies of water that are presently designated as sources [of] drinking water and the second addresses those bodies of water that may in the future be designated as sources of drinking water." Thus, "present source of drinking water" refers, according to defendants, "to those bodies of water, both natural and man-made, that are a current source of public, domestic and municipal water, e.g., Hetch Hetchy and the American River."

The Attorney General argues, on the other hand, that waters designated as being *suitable* for "domestic" or "municipal" uses in a regional water quality

control plan include *both* existing and potential sources. (See, e.g., Central Valley Region Water Quality Control Plan, *supra*, table II-1 [designating both existing and potential domestic and municipal uses].) He asserts therefore that under defendants' construction the phrase "present source of drinking water" would be wholly surplusage, because all the bodies of water they proposed for this category are designated in a water quality control plan as being suitable for domestic and municipal use. He contends accordingly that the definition of the phrase "present source of drinking water" is not confined to bodies of water that appear in water quality control plans.

We find the Attorney General's interpretation of section 25249.11, subdivision (d) to be more plausible. If defendants were correct, then it would be expected that the statute would refer to water "designated in a water quality control plan" in *both* parts of its definition of "source of drinking water." In other words, the statute would read something like: "source of drinking water is all water designated in a water quality control plan . . . as being suitable for domestic or municipal use, whether or not presently so used." But the fact that section 25249.11, subdivision (d) refers to water quality control plans only in the second part of its definition implies that the first part of the definition—present source of drinking water—was not intended to refer exclusively to bodies of water included in water quality control plans.

The fact that the Attorney General's interpretation of the phrase "source of drinking water" is consistent with a plausible reading of section 25249.11, subdivision (d), while defendants' construction is not, does not necessarily mean that the Attorney General's interpretation of the critical phrase is correct. Yet this fact weighs undeniably in his favor. Moreover, when we consider the purpose of the Act and the consequence of adopting each of the two proffered interpretations, we conclude that the Attorney General offers the only reasonable construction of "source of drinking water."

■ " '[W]here the language of a statutory provision is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted.' [Citation.] . . . Stated differently, 'Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.' [Citation.] A court should not adopt a statutory construction that will lead to results contrary to the Legislature's apparent purpose." (*Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 777 P.2d 157] (*Western Oil & Gas Assn.*).) At issue in *Western Oil & Gas Assn.* was whether the Tanner Act,

which provides a comprehensive statutory scheme for the identification and control of air pollutants on a statewide level by the State Air Resources Board, prohibited local air quality control boards from regulating emissions before they have been identified under that Act's extensive administrative procedures. In concluding that no such prohibition should be implied, we looked to the considerable authority that the local boards possessed prior to the Act, to the purpose of the Act, and to the practical consequences that would flow from a contrary construction. We found that "[i]t would . . . be unreasonable to conclude that the Legislature intended to repeal the districts' long-standing power, leaving emissions totally unregulated until the board acts. That drastic result would be contrary to the Legislature's declaration that the Tanner Act was necessary 'to achieve the *earliest* practicable control of toxic contaminants.' [Citations.] Moreover, the Legislature's obvious purpose in passing the act was to improve and strengthen air pollution regulation. The result sought by the association would be inimical to that purpose. ' "[T]he objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation." ' " (*Id.* at p. 426, italics in original.)

██ The purposes of Proposition 65 are stated in the preamble to the statute, section 1, which declares in pertinent part: "The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. The people therefore declare their rights: [¶] (a) to protect themselves and the water they drink against chemicals that cause cancer, birth defects, or other reproductive harm." (Ballot Pamp., Proposed Stats. with arguments to voters, Gen. Elec. (Nov. 4, 1986) p. 53 (hereafter Ballot Pamphlet).)

Further evidence of the Act's purpose and intent can be gleaned from the ballot materials. ██ "[W]hen . . . the enactment follows voter approval, the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) ██ An examination of the ballot summary and arguments in this case makes clear that the primary focus of the Act, aside from its warning provisions, was the protection of drinking water, i.e., the water that comes from the tap, from contamination. First, the "Official Title and Summary Prepared by the Attorney General" states in part, "RESTRICTIONS ON TOXIC DISCHARGES INTO DRINKING WATER; REQUIREMENT OF NOTICE OF PERSONS' EXPOSURES TO TOXICS. INITIATIVE

STATUTE. Provides persons doing business shall neither expose individuals to chemicals known to cause cancer or reproductive toxicity without first giving clear and reasonable warning, nor discharge such chemicals into *drinking water*." (Ballot Pamp., *supra*, at p. 52, italics added.)

Moreover, the "Argument in Favor of Proposition 65" states in part: "There are certain chemicals that are scientifically known—not merely suspected, but known—to cause cancer and birth defects. Proposition 65 would: [¶] Keep these chemicals out of our drinking water." (Ballot Pamp., *supra*, at p. 54.) Further along in the ballot argument under the title "SAFE DRINKING WATER" it states: "Proposition 65 singles out chemicals that are scientifically known to cause cancer or reproductive disorders (such as birth defects). Effectively it tells businesses: Don't put these chemicals into our drinking water supplies." (*Ibid.*)

Thus, one of the predominant purposes of the Act, as stated in the preamble, ballot summary, and arguments, was to protect drinking water from toxic contamination. In light of that purpose, the term "source of drinking water" was expansively defined to include *any* water currently destined to be used as drinking water, as well as any water officially designated as suitable for drinking water. The Act thereby creates a broad zone of protection for drinking water before it comes out of the tap, outlawing all toxic discharges that will have the probable consequences of contaminating such water. We must conclude that the electorate did not intend a breach in that protective zone by exempting discharges of lead into faucet water—where toxic contamination of drinking water is certain to occur—absent an express exclusion. Accordingly, we find the Attorney General's interpretation of the statute and the phrase "source of drinking water" to be not only faithful to the statutory language, but also "reasonable, fair and harmonious with its manifest purpose," whereas defendants' construction is "productive of absurd consequences." (*Western Oil & Gas Assn.*, *supra*, 49 Cal.3d at p. 425.)

Defendants contend that this interpretation of the statute violates the statutory construction principle known as *noscitur a sociis* (it is known by its associates). "In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." (*Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012 [9 Cal.Rptr.2d 358, 831 P.2d 798].) Defendants contend that a plumbing fixture "is markedly dissimilar from bodies of water which are or have the potential for being used as a source of drinking water," and

therefore should not be inferred to be included within the Act. But when the purpose of the Act is considered, the seeming dissimilarities between water in plumbing fixtures and natural bodies of water become less significant than their similarities. Both pertain to water that will be used for drinking purposes, and both require regulation in order to ensure safe drinking water. We therefore find defendants' argument unpersuasive.

Defendants contend that the "Analysis by the Legislative Analyst" of the Act that appeared in the ballot pamphlet supports its position. We find no such support. The analysis begins with a review of various then-existing government programs and statutes designed to protect the people of the state against possible exposures to harmful chemicals, and the agencies that implement these statutes. The analysis then explains that "[t]hese regulatory agencies must make judgments about the amounts of harmful chemicals that can be released into the environment. In doing so, they try to balance what it costs to prevent the release of chemicals against the risks the chemicals pose to public health and safety." (Ballot Pamp., *supra*, at p. 52.) The analysis then summarizes the provisions of the Act, concluding that "[b]ecause these new requirements would result in more stringent standards, the practical effect of the requirements would be to impose new conditions for the issuance of permits for discharges into sources of drinking water. In order to implement the new requirements, state agencies that are responsible for issuing permits would be required to alter state regulations and develop new standards for the amount of chemicals that may be discharged into sources of drinking water." (*Ibid.*)

Defendants contend that the reader of the analysis would have understood from the foregoing that the Act does not apply to plumbing faucets because of its reference to government-issued "permits." As they state: "It is indisputable that such permits relate to discharges to the state's surface and ground waters, and have never been issued for and have nothing to do with faucets." Yet it is clear from the context that the Legislative Analyst, in explaining the "practical effect" of the Act's new requirements, was attempting to put the Act in the context of existing environmental regulations, which the first part of the analysis was devoted to explaining. The Legislative Analyst did not suggest that all the effects and ramifications of the Act were being set forth in his brief summation. As discussed, the language of section 25249.11, subdivision (d), makes clear that Proposition 65 protects waters beyond the jurisdiction of the State Water Quality Control Board and the regional boards, and therefore beyond their permitting authority. In light of the explicit language and purpose of the statute, and the generality and brevity of the Legislative Analyst's commentary, the latter cannot plausibly be viewed as implicitly limiting the scope of the statute in the manner advocated by defendants.

Defendants also contend that we should defer to certain contemporaneous constructions of the Act by the administrative agency charged with interpreting it. For reasons discussed below, we conclude that no administrative agency has in fact endorsed defendants' position, and to the extent that some agency staff expressed views consistent with defendants' position, they are neither controlling nor persuasive.

The Act, at section 25249.12, provides that "The Governor shall designate a lead agency and such other agencies as may be required to implement the provisions of the chapter including this section. Each agency so designated may adopt and modify regulations, standards, and permits as necessary to conform with and implement the provisions of this chapter and to further its purposes." In 1987, pursuant to Governor's Executive Order No. D-61-87, the Health and Welfare Agency (HWA) was designated as the "lead agency" under the Act. HWA's interpretation of the Act is therefore of particular relevance. ■ "Although not necessarily controlling, as where made without the authority of or repugnant to the provisions of a statute, the contemporaneous administrative construction of [an] enactment by those charged with its enforcement . . . is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." (*Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1].)

■ The record shows that HWA never took a position on whether faucets are to be regulated under the Act. In response to comments regarding its promulgation of regulations to implement the Act, HWA declined the request of one commenter to further define "source of drinking water." "This definition is not necessary because this term is already adequately defined in the Act at Health and Safety Code section 25249.11, subsection (d), and any further definition could cause unnecessary confusion. The designation in regional water quality control plans mentioned in the act provide sufficient guidance on which specific bodies of water are protected under the Act." (HWA, amendment to final statement of reasons (1988) adopting Cal. Code Regs., tit. 22, § 12102 et seq.) Although defendants would have us read into this comment an implied endorsement of its position that only bodies of water mentioned in regional water quality control plans should be considered "sources of drinking water," it is evident that HWA was not, by the comment, taking a position on the question before us. Moreover, as discussed above, the statute's definition of "present source of drinking water" transcends the jurisdictional limits of the state or regional water quality control boards. Nor does HWA's report, Safe Drinking Water and Toxic Enforcement Act of 1986: A Blueprint for Effective Implementation (Fiscal Year 1989-1990), support defendants' position, as they contend, for this

document also does not consider the question whether faucet water is a source of drinking water.

After these implementing regulations were promulgated, the Plumbing Manufacturers Institute (PMI), an industry group to which most of the defendants belong, made a request for administrative guidelines exempting plumbing products from section 25249.5. In a private, unpublished letter, dated December 1, 1988, Steven A. Book, science adviser to the Secretary of HWA, responded "that the agency . . . cannot adopt such a position." Further, Book rejected PMI's central contention, namely that privately installed plumbing pipes were part of a "public water system" and therefore exempt from the Act pursuant to section 25249.11, subdivision (b).

The Book letter did go on to state that "[t]he Agency has never taken the position that the leaching of chemicals from a private plumbing facility into water within the facility constitutes a discharge into a 'source of drinking water.' The term 'source of drinking water' appears to refer to the geographic sources of water, whether used as a present source of drinking water, or simply designated by a regional water quality control board as suitable for domestic or municipal use." Defendants would have us consider these comments as HWA's definitive position on this issue, entitled to judicial deference. Yet it is clear that the Book letter cannot be taken as an implied agency endorsement of defendants' position. This is evident not only from Book's explicit refusal to adopt the position requested by PMI, but also from the conclusion of the letter, which advised, after noting that some plumbing suppliers were developing products that did not present lead exposure problems, that "avoiding the use of listed chemicals, or reducing their levels, is a good way to avoid application of the Act."

Moreover, as the Office of Environmental Health Hazard Assessment (OEHHA), the successor lead agency for the implementation of the Act,[6] pointed out in an amicus curiae brief filed with the trial court in this case, the Act's regulations prescribe two methods by which private parties can obtain administrative interpretations of the Act: an "interpretive guideline" on a general matter (Cal. Code Regs., tit. 22, § 12102, subd. (b)), or a "safe use determination" which interprets and applies the Act to a specific set of facts (*id.*, subd. (c)). Both of these types of administrative rulings require publication before their formal adoption. (See *id.*, §§ 12103, 12104.) OEHHA correctly concluded that the science adviser's letter was neither an interpretive guideline nor a safe use determination, and did not follow the public comment procedures provided for under the administrative regulations.

---

[6]In 1991, when the California Environmental Protection Agency was created, the Governor transferred "lead agency" responsibilities to OEHHA, which had been transferred to this newly created agency. (Governor's Exec. Order No. W-15-91 (July 17, 1991).)

██ Furthermore, as the Court of Appeal recently concluded, the views of an administrative agency that are "the product of a nonadversarial, ex parte process, conducted at the request of an organization that exclusively represents the interests" of a private industry group are entitled to less deference than administrative decisions made after formal proceedings in which adversarial views are aired. (*Hudgins* v. *Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109, 1125-1126 [41 Cal.Rptr.2d 46].) In *Hudgins*, the Court of Appeal declined to defer to the Labor Commissioner's private opinion letter to a retail industry group interpreting relevant statutes to conclude that the policy of deducting unidentified returned merchandise costs from employees' sales commissions was lawful. (*Ibid.*) ██ Deference to the pronouncement of an administrative agency is even less warranted in this case than in *Hudgins*, since the science adviser's private letter explicitly declined to take a definitive position on the question posed by the PMI. For all of the foregoing, the science adviser's comment does not qualify as an official pronouncement of a lead agency entitled to deference from this court.

Defendants also cite certain administrative interpretations of "source of drinking water" by the State Water Quality Control Board and by regional water quality control boards. But these agencies did not take a position on the question whether plumbing supplies are regulated within the purview of safe drinking water provisions of the Act. They were concerned only with the meaning of "source of drinking water" as it applied to bodies of water within their jurisdictions. As already discussed, the Act implicitly contemplates that there may be "present" sources of drinking water beyond the purview of the state and regional boards. The administrative agencies' interpretation of the phrase "source of drinking water" cannot, therefore, be taken as a tacit adoption of defendants' position.[7]

---

[7]Defendants also point to state and federal statutes and regulations that already regulate the lead content of plumbing fixtures. In 1985, former section 300.7 (now § 116880) was amended to mandate the Department of Health Services to adopt "building standards that will limit the use of lead materials in public and private water systems." Pursuant to this statutory mandate, the department promulgated a regulation, title 24 California Code of Regulations, section 604.10, prohibiting "water pipe and fitting with a lead content which exceeds eight (8) percent . . . in piping systems used to convey potable water." The 8 percent limitation is also found in a provision of the federal Safe Drinking Water Act, codified at 42 United States Code section 300g-6. Defendants do not argue that any of these statutes or regulations modify, preempt, or render unnecessary section 25249.5. The Attorney General and his amici curiae argue, indeed, that significant toxic exposures may occur even within the legally allowable lead levels. (See National Academy of Science, Measuring Lead Exposure in Infants, Children and Other Sensitive Populations (1993) 129.)

The precise relationship between these existing laws and Proposition 65 is unclear, but greater knowledge of this relationship is unnecessary to resolve the present litigation. We note only that Proposition 65 purported to partially supersede existing environmental laws, which

Finally defendants argue that the Act is a "penal" statute because, in addition to provisions for injunctive relief set forth in section 25249.7, subdivision (a), the Act also provides in section 25249.7, subdivision (b) a civil penalty of up to $2,500 per day for each violation of section 25249.5. Defendants further contend that because the Act is penal in nature, it should be strictly construed in their favor, and that therefore we should adopt the construction of the term "source of drinking water" favorable to their position. ■ It is indeed the case that "[w]hen language which is susceptible of two constructions is used in a penal law, the policy of this state is to construe the statute as favorably to the defendant as its language and the circumstance of its application reasonably permit." (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288].) ■ But we find defendants argument unconvincing for two reasons. First, we do not believe, in light of the language and purpose of the Act discussed above, that it is "reasonably susceptible" to the construction defendants propose. ■ The rule of strict construction of penal statutes " ' "is not an inexorable command to override common sense and evident statutory purpose." ' " (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1145-1146 [240 Cal.Rptr. 585, 742 P.2d 1306].)

■ Second the rule of strict construction of penal statutes has generally been applied in this state to criminal statutes, rather than statutes which prescribe only civil monetary penalties. (See, e.g., *People* v. *Forbis* (1996) 42 Cal.App.4th 599, 603-604 [49 Cal.Rptr.2d 836]; *In re Rottanak K.* (1995) 37 Cal.App.4th 260, 269 [43 Cal.Rptr.2d 543]; *People* v. *Barraza* (1988) 197 Cal.App.3d 613, 617 [243 Cal.Rptr. 98]; *People* v. *Martin* (1985) 168 Cal.App.3d 1111, 1123-1124 [214 Cal.Rptr. 873]; *In re Fain* (1983) 145 Cal.App.3d 540, 549 [193 Cal.Rptr. 483]; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; *People* v. *Smith* (1955) 44 Cal.2d 77, 79 [279 P.2d 33]; *People* v. *Ralph* (1944) 24 Cal.2d 575, 581 [150 P.2d 401]; see also 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 28, pp. 37-38, and cases cited therein.) As was first stated in *Ex parte Rosenheim* (1890) 83 Cal. 388, 391 [23 P. 372], a criminal case, and reiterated many times since, "[w]hile it is true, the rule of the common law that penal statutes are to be strictly construed has been abrogated by [Penal Code section 4], . . . it is also true that the defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute . . . ."

■ This rule of strict construction for criminal statutes, also referred to as the rule of "lenity," was explained by the United States Supreme Court in

the proponents of the initiative argued were not "tough enough." (Ballot Pamp., *supra*, at p. 54.)

somewhat different terms: "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability. [Citation.] ('[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity')." (*Liparota* v. *United States* (1985) 471 U.S. 419, 427 [85 L.Ed.2d 434, 441, 105 S.Ct. 2084].) Thus, as both *Rosenheim* and *Liparota* recognize, criminal penalties, because they are particularly serious and opprobrious, merit heightened due process protections for those in jeopardy of being subject to them, including the strict construction of criminal statutes.

*Hale* v. *Morgan* (1978) 22 Cal.3d 388 [149 Cal.Rptr. 375, 584 P.2d 512] (*Hale*), cited by defendants, does not support their position that all statutes with *civil monetary* penalties should also be strictly construed. In that case, a landlord was found to be liable under Civil Code section 789.3 for terminating a tenant's utilities with the intent to terminate his tenancy. The fact of the landlord's liability under the statute was not at issue. Rather we addressed questions pertaining to the *amount* of civil penalty which could be assessed against him. We held that the statute in question violated the due process clause of the federal and California Constitutions because it did not permit the trial court any discretion in imposing the civil penalty—it did not allow the court, for example, to take into account the good faith motivation of the offending landlord. (22 Cal.3d at pp. 404-405.) We also construed the penalty portion of the statute, subdivision (b) of Civil Code section 789.3, determining when a tenant can be said to be "deprived" of utility services for purposes of quantifying the landlord's liability. We concluded, after consulting the dictionary definition of "deprived," that a tenant would not be considered to be deprived of utility services if "the tenant actually succeeds in restoring service, or, by reasonable effort, could have done so." (22 Cal.3d at p. 406.) On our way to that conclusion, we stated in dictum that "[b]ecause the statute is penal, we adopt the narrowest construction of its *penalty clause* to which it is reasonably susceptible in the light of its legislative purpose." (*Id.* at p. 405, italics added.)

*Hale* did not purport to alter the general rule that civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose. (See, e.g., *Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 357 [185 Cal.Rptr. 453, 650 P.2d 328]; *Kizer* v. *Waterman Convalescent Hospital, Inc.* (1992) 10 Cal.App.4th Supp. 8, 15 [13 Cal.Rptr.2d 239]; *Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239, 250 [211 Cal.Rptr. 792]; *Montessori*

*Schoolhouse of Orange County, Inc.* v. *Department of Social Services* (1981) 120 Cal.App.3d 248 [175 Cal.Rptr. 14]; *California State Restaurant Assn.* v. *Whitlow* (1976) 58 Cal.App.3d 340, 347 [129 Cal.Rptr. 824]; *Buchwald* v. *Superior Court* (1967) 254 Cal.App.2d 347, 354-358 [62 Cal.Rptr. 364].) The focus of *Hale* was rather on safeguarding against the excessive penalization of those found liable under a civil statute. We construed a portion of the statute that was concerned solely with the manner of calculating the amount of penalty—the defendant did not claim that the portion of the statute pertaining to the fact of his liability was ambiguous. We accordingly specified that we were narrowly construing the "penalty clause." (*Hale, supra*, 22 Cal.3d at p. 405.)

In the present case we are concerned with a statute, section 25249.5, that defines the conduct proscribed by the Act, and the scope of the government's authority to enjoin and prohibit that conduct, rather than the method of assessing the amount of penalty for transgressing the proscription. We do not consider, for example, which acts by faucet manufacturers or distributors constitute a discrete "violation" of the Act that would subject them to a separate monetary penalty under section 25249.7, subdivision (b) (see *Hale, supra*, 22 Cal.3d at pp. 401-402; *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 42-44 [127 Cal.Rptr. 122, 544 P.2d 1322]; *People* v. *Superior Court* (1973) 9 Cal.3d 283, 288-289 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191]); nor do we consider whether their alleged good faith belief that they were not violating the statute should affect the penalty for which they are liable.[8] Accordingly, *Hale*'s dictum is inapposite. Although there may be circumstances in which civil statutes should be strictly construed, we find no reason to do so in this case.

In sum, we consider Proposition 65 to be a remedial statute intended to protect the public from, among other things, toxic contamination of its drinking water. We construe the statute broadly to accomplish that protective purpose. As discussed above, we conclude that the Attorney General's construction of section 25249.5 to include faucet water as a source of drinking water is not only a reasonable reading of the language of the statute,

---

[8]Because we are not called on to address the question of penalty, we do not determine whether defendants in the present case had a "good faith" belief that they were not violating section 25249.5, which would mitigate or nullify their civil culpability for past conduct. We do not consider, for example, whether seemingly favorable administrative agency interpretations of relevant statutory provisions were reasonably relied on, and would make the imposition of statutory penalties a violation of defendants' due process rights.

but is also harmonious with its basic remedial objectives, i.e., protection of the public.[9]

### III. DISPOSITION

For all the foregoing, the judgment of the Court of Appeal is reversed and the cause is remanded with directions to cause issuance of a peremptory writ of mandate as prayed.

George, C. J., Kennard, J., Werdegar, J., and Brown, J., concurred.

**BAXTER, J.,** Dissenting.—The health dangers of lead in water faucets are significant, but I cannot join the majority's tortured effort to endorse Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65), as a weapon for attacking the problem. Though Proposition 65 includes landmark protections against environmental pollution of drinkable surface and groundwaters, it does not purport to address all means by which contaminants may appear in water drawn from the tap. When fairly considered in context, neither the language of Proposition 65 (Health & Saf. Code, §§ 25249.5-25249.13)[1] nor its interpretive aids support the majority's conclusion that the chemical transfer of lead from water faucets into tap water is a "discharge or release" of toxin into a "source of drinking water" covered by the statute.

Both the trial court and the Court of Appeal determined, contrary to the majority in this court, that water faucets are not a "source of drinking water" governed by Proposition 65. Because I agree with their conclusions in this regard, I respectfully dissent.

When construing Proposition 65, we must keep several things in mind. First, it was adopted not by the considered processes of the Legislature, but by the all-or-nothing power of the popular vote. The people's right of initiative is precious, and measures enacted by this means are to be interpreted liberally to honor the electorate's intent. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador Valley*).) On the other hand, the voters have no special knowledge of technical meanings the law may attach

---

[9]Defendants do not contend that they did not "knowingly release or discharge" a toxic chemical into water within the meaning of section 25249.5. Thus, in reversing the judgment, we express no opinion regarding construction of this portion of the statute. Accordingly, contrary to the suggestion of the dissent, this opinion does not implicitly endorse the position that those businesses which have not retrofitted lawfully purchased plumbing fixtures are "knowing dischargers" within the meaning of the Act.

[1]Further unlabeled statutory references are to the Health and Safety Code.

to particular words or phrases used in such a statute. Moreover, the initiative process provides little opportunity to consider, debate, or modify the language arbitrarily chosen by the drafters of a ballot measure. Extrinsic aids to construction are typically sparse and unreliable. Hence, in ascertaining the purposes of an initiative statute, we should adhere closely to the ordinary, commonsense meaning of its language, as viewed in context and confirmed by the available outside evidence of the voters' intent. (*Id.* at pp. 245-246.) In my view, neither the ordinary, commonsense meaning of the words of Proposition 65, nor available extrinsic aids to its interpretation, suggest any application to lead in water faucets.

Second, we must uphold the standards of statutory clarity required by the Constitution. Due process demands that any statute be precise enough to convey its meaning to a person of reasonable intelligence. (E.g., *Amador Valley, supra,* 22 Cal.3d at p. 244.) But special concerns arise when either civil or criminal penalties are at issue. Violations of Proposition 65 are not criminal in nature, but the statute does impose civil penalties of up to $2,500 per day for each such violation (§ 25249.7, subd. (b)), and the Attorney General's complaint seeks statutory penalties without limitation.

Though the majority imply otherwise, fundamental fairness dictates that before a law subjects persons to such significant sanctions, criminal or civil, it should give " 'fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed.' " (*Mourning* v. *Family Publications Service, Inc.* (1973) 411 U.S. 356, 375 [36 L.Ed.2d 318, 333, 93 S.Ct. 1652], quoting *McBoyle* v. *United States* (1931) 283 U.S. 25, 27 [75 L.Ed. 816, 818, 51 S.Ct. 340]; see *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398-406 [149 Cal.Rptr. 375, 584 P.2d 512].) Proposition 65 supplies no such fair warning that it applies to lead in water faucets.

Third, we must interpret any statute in a manner that will avoid absurd applications the adopters cannot have contemplated. (*Amador Valley, supra,* 22 Cal.3d at p. 245; see also *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 777 P.2d 157].) A conclusion that Proposition 65 applies to lead in water faucets has such mischievous implications. I therefore part company with the majority's analysis.

I first examine the plain language of the statute. That language makes clear that while the purposes of the measure were broadly stated (Ballot Pamp., Proposed Stats. with arguments to the voters, Gen. Elec. (Nov. 4, 1986) p. 53 (Ballot Pamp.)), the reach of its codified provisions is not

universal. Section 25249.5 provides in pertinent part that "[n]o person in the course of doing business shall knowingly discharge or release a [known carcinogen or reproductive toxin] *into water or onto or into land where such chemical passes or probably will pass into any source of drinking water* . . . ." Section 25249.11, subdivision (d), defines "[s]ource of drinking water" as "either a present source of drinking water or water which is identified or designated in a water quality control plan adopted by a regional [water quality control] board as being suitable for domestic or municipal uses."

As the majority suggest, the dictionary defines "source" to include a point of origin, of emanation, or of procurement. (Webster's Third New Internat. Dict. (3d ed. 1961) p. 2177.) But the voters indicated in several ways what meaning they intended. They identified two "source[s] of drinking water" with which they were concerned—first, "present source[s]," and second, those waters "identified or designated in a water quality control plan . . . as being suitable for domestic or municipal uses." (§ 25249.11, subd. (d).) As the majority concede, the latter portion of the definition necessarily includes only those surface and groundwaters, natural and artificial, which the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.; Porter-Cologne Act) places under the planning jurisdiction of regional water quality control boards.

As defendants and their amici curiae suggest, the two prongs of the definition must logically be read in pari materia, the pertinent distinction being temporal. Since the first prong of the definition expressly addresses "present source[s]" of drinking water, the second, by process of elimination, implicitly addresses *potential* or *future* "source[s]." And since the "future source" definition is limited to surface and groundwaters within the jurisdiction of regional water quality control boards, the "present source" definition must be similarly confined. This interpretation satisfies the principle of *noscitur a sociis*, which requires us to adopt a restrictive meaning of a particular item in a series if to do otherwise would make it markedly dissimilar to other items on the same list. (*Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012 [9 Cal.Rptr.2d 358, 831 P.2d 798].)

The majority, like the Attorney General, insist that this analysis renders the "present source" language surplusage, because under the Porter-Cologne Act, regional water quality control boards and their plans are concerned with *both* present and potential surface and groundwater sources of drinking water. Thus, they reason, the second prong of section 25249.11, subdivision (d), must refer to *all* surface and groundwater "source[s]" of drinking water, whether present or potential. The separate reference to "present source[s],"

they suggest, is therefore a further expansion of coverage, and must mean "source[s]" *other than* surface and groundwaters.

But this construction is implausible for reasons which support the *noscitur a sociis* principle. First, it would mean that the term "present source[s]," contrary to ordinary understanding, would not encompass all current "source[s]" of drinking water, but only those other than surface and groundwaters. Second, it would signify that while present "source[s]" of drinking water are broadly defined to include all stages and devices through which drinking water now passes, future "source[s]" would be restricted to surface or groundwaters covered by the Porter-Cologne Act. There appears no reason to suppose that the voters wished to distinguish "present" and "future" sources in this manner. Indeed, the electorate could not have intended such a strained and dissonant meaning.

Instead, the definitional purpose of section 25249.11, subdivision (d), most readily distills to the following: The electorate was concerned about both "present" and potential repositories of the public drinking water supply, and wished Proposition 65 to protect both equally. While the "present source[s]" of drinking water were already known, so that no extrinsic description was required, some descriptive standard was necessary to determine what potential repositories of a similar kind, not yet in use, should also come within the provisions of Proposition 65. The voters chose to provide that the future or potential repositories protected by Proposition 65 would be those surface and groundwaters designated in regional water quality control plans as "suitable" for domestic or municipal use. Under this reading, if future sources are limited to surface and groundwater respositories, "present source[s]" are equally so limited.

The voters also made clear in another way that pollutable surface and groundwater sources, not delivery systems, were the target of Proposition 65. In section 25249.5, they prohibited the "[knowing] discharge or release" of designated toxins "*into water or onto or into land* where such chemical passes or probably will pass into any source of drinking water." (Italics added.) By placing the parallel phrases "into water" and "onto or into land" in close juxtaposition, and by qualifying both with the phrase "where such chemical passes or probably will pass into any source of drinking water," the statute signals that it uses the terms "water" and "land" in the same environmental and geographical sense. In each case, it seeks simply to prevent commerce from polluting the surface and groundwaters which feed or form the present or potential drinking water supply, either directly by release "into" those waters themselves, or indirectly by release "into or onto land" from which such contamination might spread to *the same* waters.

The limited intent of the "discharge or release" provision of Proposition 65 is further apparent when this provision is compared with the statute's companion requirement of "exposure warnings." As to the latter, the statute provides in pertinent part that "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to [a carcinogen or reproductive toxin identified by the state] without first giving clear and reasonable warning to such individual . . . ." (§ 25249.6.)

This language leaves little doubt that the prohibition against unwarned "exposure" encompasses all possible ways in which a business might knowingly cause such exposure, and demonstrates that the drafters knew how to achieve that broad coverage. Under these circumstances, use of more restrictive language in the prohibition against polluting "*source[s]* of drinking water" must be deemed significant. Had the drafters intended to ban all business conduct which resulted in the knowing contamination of tap water, they presumably would have employed words to that effect.

If the language of Proposition 65 itself were ambiguous, which it is not, the available ballot materials, on which the voters presumably relied for their understanding of the measure, also contravene the expansive construction adopted by the majority. In general, these materials confirm that the voters understood they were prohibiting businesses from knowingly discharging significant levels of identified toxins where those substances might contaminate the surface and groundwaters which form the state's actual or potential "source[s]" of public drinking water.

Thus, in his analysis of the proposal, the Legislative Analyst summarized the existing laws governing waste disposal, contamination of drinking water, exposure to harmful substances in the workplace, and use of pesticides. He noted that these laws required the enforcing agencies to make judgments about the levels of allowable exposure. Proposition 65, he indicated, would tighten the standards for knowing release by businesses of carcinogens and reproductive toxins into any "source of drinking water." "[T]he practical effect of the requirement," he declared, "would be to impose new conditions for the *issuance of permits* for discharges into sources of drinking water." (Ballot Pamp., *supra*, at p. 52, italics added.) Nothing in the Legislative Analyst's explanation refers to the water delivery system in general, or to water faucets in particular. Indeed, his emphasis on new "permit" standards as "*the* practical effect" of Proposition 65 focused the voters' attention on

conduct which is regulated by "permit," i.e., the "dumping" of toxins into the geographical origins and respositories of drinking water.[2]

Similarly, the ballot arguments for Proposition 65 are rife with inferences and assumptions that Proposition 65 was concerned with the pollution of geographical "source[s]" of water consumed by the public. For example, the argument in favor of the initiative stated in no uncertain terms: "Effectively, [Proposition 65] tells businesses: Don't put these chemicals into our drinking water *supplies*." (Ballot Pamp., *supra*, p. 54, italics added.) The argument also stressed that Proposition 65 was intended to toughen the enforcement of existing "toxic laws," and would sharply increase penalties for "toxic crimes like midnight dumping." (*Ibid.*) "These new laws," the argument insisted, "*will not take anyone by surprise*. They apply only to businesses that *know* they are putting one of the [identified] chemicals out *into the environment . . . .*" (*Ibid.,* second italics in original.)

In their rebuttal to the opponents of Proposition 65, the proponents returned to themes suggesting the measure's focus on buttressing existing laws against environmental pollution, particularly the discharge of toxic industrial and agricultural byproducts. Thus, they declared: "Who's really against Proposition 65? [¶] The big oil and chemical companies are leading the opposition—because they know they would be forced to stop dumping extremely dangerous chemicals into your drinking water . . . . The existing laws don't stop them. Proposition 65 will." (Ballot Pamp., *supra*, p. 55.) The rebuttal further explained that "Proposition 65 means tougher law enforcement" against "polluters." (*Ibid.*) It stated that "Proposition 65 applies to the big businesses that produce more than 90% of all *hazardous waste* in California (according to official state estimates)." (*Ibid.,* italics added.)

In the context of these explanations, the proponents sometimes made shorthand references to the pollution of "drinking water." Responding to the opponents' claims that Proposition 65 "is filled with exceptions" and "hurts farmers" (Ballot Pamp., *supra*, at p. 54), the proponents also noted that the measure "applies equally" to all California "businesses" with more than 10 employees. (*Id.* at p. 55.) But these references do not detract from the focus on geographical pollution otherwise apparent. Nothing in the ballot arguments, pro or con, remotely implied that plumbing fixtures installed in homes and businesses are covered "source[s]" of drinking water, or that lead

---

[2]In his brief Official Title and Summary of Proposition 65, the Attorney General described the statute more broadly as imposing restrictions on toxic discharge "into drinking water." (Ballot Pamp., *supra*, p. 52.) But the value of this description is limited by its facial inaccuracy, in that it ignores the measure's reference to "*source[s]* of drinking water." The words of the statute, read in their own context, must prevail over an inaccurate secondary description.

transferred from a faucet to water stored therein constitutes a prohibited "discharge or release" of toxin into such a "source."[3]

Any ambiguity in the statutory term "source[s] of drinking water" is also resolved against the majority by "the contemporaneous construction . . . of the administrative agencies charged with implementing the new enactment." (*Amador Valley, supra,* 22 Cal.3d at p. 245.) Soon after the adoption of Proposition 65, and pursuant to its express requirements, the Governor designated the Health and Welfare Agency (HWA) as the "lead agency . . . to implement the provisions of this chapter," with authority to "adopt and modify regulations, standards, and permits as necessary" to implement and enforce the new law. (§ 25249.12.) In the course of HWA's 1987 proceedings to adopt implementing regulations, the agency was asked to include a more precise definition of the statutory term "source of drinking water." HWA declined, but its official reason for doing so, formally stated as part of the rulemaking process, is highly significant.

The agency declared: "This definition is not necessary because this term is already adequately defined in [Proposition 65] at Health and Safety Code section 25249.11, subdivision (d), and any further definition could cause unnecessary confusion. *The designations in regional water quality control plans mentioned in [Proposition 65] provide sufficient guidance on which specific bodies of water are protected under the [initiative statute].*" (HWA, amendment to final statement of reasons (1988) adopting Cal. Code Regs., tit. 22, § 12102 et seq., italics added.)

The majority find HWA's statement of no significance for two reasons. First, they suggest, the statement shows HWA simply "took no position" on the statute's meaning, and particularly on the question of water faucets, which was not specifically presented for its consideration at that time. Second, they assert, HWA's reference to regional water quality control plans is not dispositive, because water faucets are beyond the jurisdiction of such plans.

However, in the course of rulemaking, and as the official reason for *omitting* a regulation, HWA formally declared its *assumption*, too clear from the statute to require elucidation, that Proposition 65 applies *only* to geographical sources of drinking water. Nor did HWA's reference to regional water plans imply an incomplete expression of its views. Under section

---

[3]The opponents' attack urged that existing laws were working, that Proposition 65, by contrast, was unworkable and discriminatory, particularly against agriculture, and that the measure would encourage private "bounty hunters" and their lawyers. (Ballot Pamp., *supra,* pp. 54, 55.)

25249.12, the jurisdiction of HWA, as "lead agency" for implementation of Proposition 65, extended to all of *its* "provisions," whether within or without the purview of regional water plans under the Porter-Cologne Act.

Hence, *HWA*'s statement that regional water quality control plans provide "sufficient guidance" about covered "source[s] of drinking water" cannot be read as limited to matters within the permissible scope of such plans. Rather, the statement reflects HWA's official position that the "source[s] of drinking water" protected by Proposition 65 are those designated in the regional water quality control plans. This construction is consistent with a fair reading of the statutory language, and thus deserves our deference.[4]

The majority's extension of Proposition 65 to cover emanations of lead from faucets into tap water has broad, disturbing, and uncharted implications which the voters cannot have considered, and which cause particular concern in light of the potentially onerous statutory penalties. At the outset, it is not clear what constitutes a complete and separate "violation" of the statute in this regard, and thus exposes the violator to a separate penalty. Proposition 65 provides that a violation occurs whenever one knowingly "discharge[s] or release[s]" a covered toxin into a "source of drinking water." Thus, under the majority's view of the statutory terms, a faucet manufacturer or seller who knows that his product contains lead may well commit a completed violation every time one of his installed products is turned on. Thus, the manufacturer or seller may be exposed to tens of thousands of penalties each day.

Equally disturbing is the prospect that any covered "person in the course of doing business" would also be exposed to limitless penalties for *using* faucets in the business with knowledge that they leached lead. Under such circumstances, such a person would presumably commit a violation each time a lead-leaching faucet is turned on in the conduct of the enterprise.

Moreover, even if Proposition 65 has only "prospective" operation, manufacturers, sellers, and business users may incur penalties from the operation

---

[4] I am not persuaded to a contrary view by the subsequent "private, unpublished letter" from HWA science adviser Book to the Plumbing Manufacturers Institute (PMI). As the majority indicate, PMI had requested administrative guidelines declaring that plumbing fixtures were exempt from Proposition 65. Book's response stated that HWA "cannot adopt such a position." For reasons amply explained by the majority, Book's letter does not evidence an official view of the agency and does not meet the criteria for judicial deference to a contemporaneous administrative construction. In any event, Book's letter does not imply HWA's view that plumbing fixtures were covered. On the contrary, Book commented that "[t]he Agency has never taken the position that the leaching of chemicals from a private plumbing facility into water within the facility constitutes a discharge into a 'source of drinking water.' The term 'source of drinking water' appears to refer to the geographic sources of water, whether used as a present source of drinking water, or simply designated by a regional water quality control board as suitable for domestic or municipal use."

of faucets that were legally sold and installed *before the statute took effect.* A violation of Proposition 65 occurs not by the sale or installation of any fixture, but by a later knowing "discharge or release" of toxins. Hence, a faucet sold and installed before the effective date of Proposition 65 may produce a violation, and thus a penalty, each time it leaches lead into water after the effective date of Proposition 65, if the manufacturer, seller, or business user realizes that the faucet has this dangerous characteristic. Under such catastrophic circumstances, business operators, once apprised that their faucets leach lead, could only forestall the endless potential accumulation of penalties by retrofitting their premises entirely and immediately with lead-free faucets.[5]

Indeed, the bleeding may not even stop there. Under the majority's theory, there is no principled basis for distinguishing water faucets from *any other* plumbing fixture which leaches lead while holding water that will ultimately flow from a bathroom or kitchen tap. By analogy to the majority's reasoning, any such fixture would "release or discharge" a prohibited toxin into a "source" of drinking water. Thus, insofar as a business operator must replace faucets that contain lead, a similar obligation would appear to arise for any other pipes and fixtures on the premises that contain lead.

The voters cannot have intended such results when they enacted Proposition 65. The statute's focus on "discharge or release" of toxins into a "source of drinking water" was designed to prevent businesses from intentionally contaminating the state's surface and underground repositories of drinking water; it is not formulated or adapted to combat the dangers of lead emanating from fixtures installed in a home or business. The majority err by their misguided attempt to fit the "square peg" of Proposition 65's "discharge or release" provisions into the "round hole" represented by the problem of lead-leaching fixtures.

---

[5]One might argue that public officials authorized to bring enforcement actions under Proposition 65 would be unlikely to attack manufacturers, sellers, or business users of faucets in this fashion, but the opportunity will be obvious to private citizens, who may sue for both injunctive relief and penalties if the authorized public officials decline to do so. (§ 25249.7, subd. (d).) Even if penalties recovered by private citizens go to the public coffers, a point not made clear by Proposition 65, their lawyers may still be eligible for hefty fees arising from success in a "public interest" lawsuit. (Code Civ. Proc., § 1021.5.) So the incentive may well exist to ensure that a manufacturer, seller, or business user knows his faucets leach lead, demand enforcement by public officials as the statute requires, then commence a private suit if such enforcement is declined.

Nor is it unrealistic to assume that a court might penalize manufacturers, sellers, or business users for the continuing operation of lead-leaching faucets that were legal when sold and installed. Even if the settlement agreements in this case effectively immunize *these defendants* from suit *by the State of California* for faucets they sold before the agreements took effect, the agreements have no greater legal effect.

By contrast, other state law is better designed and adapted to combat lead contamination of tap water by private plumbing fixtures. As required by Health and Safety Code section 116880, the Department of Health Services has amended the California Plumbing Code to establish a maximum lead content for pipes and pipe fittings used to convey potable water. (Cal. Code Regs., tit. 24, § 1004, subd. (g).) Moreover, as noted, Proposition 65 itself requires a covered business to warn persons before it knowingly "expos[es]" them to significant levels of identified carcinogens or reproductive toxins, including lead.

For all these reasons, I conclude that by merely manufacturing and selling faucets containing lead, defendants did not "discharge or release" lead into a "source of drinking water" within the meaning of Proposition 65, as charged in the first and second causes of action of the Attorney General's complaint. Accordingly, the trial court correctly sustained defendants' demurrer to this portion of the complaint, and the Court of Appeal properly upheld that determination. The judgment of the Court of Appeal should therefore be affirmed.

Chin, J., concurred.

The petition of real parties in interest for a rehearing was denied February 5, 1997. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.