Filed 9/25/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| ROBERT GLEN GOLIGHTLY, | B246413 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC436267) |
| v. | |
| GLORIA MOLINA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan S. Rosenfield, Judge.  Affirmed.

Huskinson, Brown & Heidenreich, David W.T. Brown and Paul E. Heidenreich for Plaintiff and Appellant.

Judy W. Whitehurst, Assistant County Counsel, Dawyn Harrison, Principal Deputy County Counsel; Miller Barondess, Louis R. Miller, Mira Hashmall and Vinay Kohli for Defendants and Respondents.

———————————

Plaintiff and appellant Robert Glen Golightly (Plaintiff) appeals a judgment following a grant of summary judgment in favor of defendants and respondents County of Los Angeles (County) and the five members of the County Board of Supervisors (Board), namely, Gloria Molina, Zev Yaroslavsky, Don Knabe, Mark Ridley-Thomas and Mike Antonovich (sometimes collectively referred to as the County).

The essential issue presented is whether the procedure by which the County enters into Social Program Agreements (SPAs) with social service organizations that provide social services to county residents is subject to the Brown Act (Gov. Code, § 54950 et seq.), a statutory scheme which imposes open meeting requirements on legislative bodies.

Proposed SPAs are individually scrutinized by the Executive Officer of the Board (Board's Executive Officer), County Counsel, County Auditor-Controller, and ultimately, by the County Chief Executive Officer (County CEO), and the approval of each is required. However, the four signatories do not collectively decide to approve an SPA. Rather, a proposed SPA is reviewed in sequence by the four signatories, for issues within each one's purview. The Brown Act applies to meetings of legislative bodies. (Gov. Code, § 54952.2.) The four SPA signatories do not constitute a legislative body and do not deliberate collectively in approving a SPA. Therefore, Plaintiff's Brown Act claim is meritless.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Pleadings*.

On April 22, 2010, Plaintiff, a taxpayer, filed his original complaint against the County. The fourth amended complaint, which is the operative pleading, alleged causes of action for: waste of public funds (Code Civ. Proc., § 526a); violation of the Brown Act (Gov. Code, § 54950 et seq.); declaratory relief for ultra vires acts; and conflicts of interest including violations of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.).

The gravamen of Plaintiff's action is that the County "secretly uses public funds" to enter into SPAs with social service providers in violation of the Brown Act, and

2

instead of being publicly approved by the Board, SPAs are actually entered into by County officials pursuant to an improper delegation of decisionmaking authority by the Board.

2. *County's motion for summary judgment.*

The County moved for summary judgment or summary adjudication of issues. It argued, inter alia: Plaintiff's Brown Act claim fails because the Board did not create a "legislative body" and there is no evidence of a secret meeting; the Board is not required to vote on every discretionary expenditure and the delegation of authority to the County CEO and others cannot support a Brown Act claim; the waste claim fails as it is predicated on the Brown Act claim; the Board's delegation of authority was lawful, and courts cannot interfere with lawful delegations. Further, there was no evidence the County violated the Political Reform Act or the conflict of interest statute.

In opposition, Plaintiff argued: the County's motion had failed to address the hundreds of allegations in his fourth amended complaint; the County failed to establish that a single discretionary expenditure was not wasteful; the decisions regarding SPA discretionary expenditures were made by a "legislative body" and required open meetings pursuant to the Brown Act; the Board has only limited power to delegate its discretionary authority; and the County did not submit sufficient evidence to summarily adjudicate the cause of action for conflicts of interest.

In reply, the County argued Plaintiff "has provided virtually no evidence in opposition to [the] summary judgment motion. Indeed, after propounding 1,700 written discovery requests, taking 18 days of deposition and receiving more than 70,000 pages of documents, Plaintiff is still unable to provide evidence that any of the Supervisors had a conflict of interest with respect to any transaction. Plaintiff has not presented any evidence of a 'secret meeting' held by the Supervisors (even though Plaintiff unequivocally makes that allegation in the [fourth amended complaint]). And Plaintiff has not presented any evidence of wasteful conduct. . . . Plaintiff cannot defeat summary judgment by relying on his own pleadings. If Plaintiff had any evidence to support his

3

claims, this would have been the time to submit it to the Court—he cannot proceed to trial on the basis of unsupported allegations."

3. *Plaintiff's cross-motion for summary adjudication*.

Plaintiff moved for summary adjudication on the County's third affirmative defense that its alleged wrongful acts or omissions were based on the exercise of a legislative or discretionary function and therefore such claims are barred by the County's legislative immunity.

4. *Trial court's ruling.*

After hearing the matter, the trial court granted summary judgment in favor of the County. In an extensive writing ruling, the trial court held, inter alia:

In creating a procedure for processing SPAs, the Board did not create a "legislative body" within the meaning of the Brown Act. The Board's Executive Officer, County Counsel, Auditor-Controller, and County CEO act as administrative officers who are delegated specific responsibility in reviewing proposed SPAs, but they are not a "commission, committee, board, or other body" with regard to the SPA approval process. The Brown Act "is concerned with the collective investigations and deliberations" of a legislative body. The four SPA signatories do not meet as a body to discuss proposed SPAs, and "do not collectively decide to approve a SPA, but rather . . . each signatory has a separate obligation to review the proposed SPAs to meet county contracting standards." Therefore, Plaintiff failed to raise a triable issue with respect to his Brown Act claim.

The "backbone of Plaintiff's waste claim appears to be that every single expenditure of SPA funds constitutes waste because Defendants failed to comply with the Brown Act." This claim fails for the reasons already stated.

Plaintiff also contended that all SPA expenditures involve waste because the Board improperly delegated authority over a discretionary process to county administrators. The claim was meritless because the evidence established the Board retained control over fundamental policy decisions, and its delegation of SPA authority contained adequate safeguards.

4

As for Plaintiff's claims the Supervisors allegedly participated in governmental decisions in which they had a financial interest (Gov. Code, § 87103) and violated the prohibition on elected officials being financially interested in a contract made by them in an official capacity (Gov. Code, § 1090), the trial court relied on Plaintiff's factually devoid discovery responses. Those questions were as follows: "Are you aware [from sources other than your attorney] of any conflict of interest between any of the supervisors' offices and any social program agreement recipients?"; "Are you aware of any . . . social program agreement recipients who provided campaign donations to any of the supervisors' officers [*sic*]?"; "Are you aware of any instances in which any of the supervisors had a financial interest in any organizations that received social program agreement funds?"; "Do you know whether any of the county supervisors are on the boards of directors of any of the organizations that are listed here?"; "Do you know whether any of the county supervisors are on a board of advisors with respect to any of the organizations that are listed here?"; "Do you know whether any of the county supervisors are paid by any of the organizations that are listed here?"; "Do you know whether any of the county supervisors have a financial interest in any of the organizations that are listed here?"; "Do you know whether any of the spouses, of any of the supervisors, has a financial interest [in] any of the organizations that are listed here?"; "Do you know whether any of the children, of any of the supervisors, has a financial interest [in] any of the organizations that are listed here?"; "Do you have any documents reflecting a relationship between any of the supervisors and the organizations that are listed on pages 98 and 99 of the fourth amended complaint?" *To each of the above questions*, Plaintiff answered, "No." Plaintiff's responses "were admissible evidence to show the absence of facts to support the allegations of the complaint."

The trial court concluded, "Under the doctrines of legislative immunity and separation of powers, the courts generally should avoid marching into the legislative domain, except in the most egregious circumstances. When the layers of the proverbial onion are stripped away in this lawsuit, we see a plaintiff as a concerned taxpayer who

5

complains that the Los Angeles County Board of Supervisors has been illegally expending funds and failing to properly account for certain expenditures. Plaintiff has chosen theories of illegal meetings under the Brown Act, waste and conflicts of interest as his theories in pursuit of judicial intervention to right these perceived wrongs. While it is surely healthy for all levels of citizenry and government to continually look for ways to 'build a better mousetrap' in terms of government operations and accountability, not all activity of a legislative body will meet with the approval of all citizens. This case, in a nutshell, involves the question of whether the Board of Supervisors has lawfully delegated contracting authority for SPAs to the administrative level. The Court can find no secret meetings, unlawful meetings or other violation of the Brown Act, no acts of waste and no conflicts of interest under the evidence herein presented. In a county the size of Los Angeles . . . the concept of careful delegation makes perfect sense and is authorized by law. Additionally, the evidence discloses that the SPAs are adequately accounted for in the postings by the County. [¶] Defendants' motion for summary judgment is granted. Plaintiff's motion for summary adjudication [is] moot."

5. *Judgment and postjudgment proceedings.*

On November 5, 2012, pursuant to the earlier grant of summary judgment, the trial court entered judgment in favor of the County. On January 3, 2013, Plaintiff filed a timely notice of appeal from said judgment.

On January 11, 2013, during the pendency of the appeal, Plaintiff filed a motion in the trial court for attorney fees pursuant to Code of Civil Procedure section 1021.5 under a catalyst theory of recovery. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553.) On March 15, 2013, the trial court heard and denied Plaintiff's attorney fee motion. Plaintiff did not appeal that order.

6

## CONTENTIONS

We summarize Plaintiff's contentions as follows:  the Board's delegation of its power to the County CEO to enter into SPAs was improper; the County's review process for SPAs contravenes the Brown Act; because the SPAs violate open meeting requirements, SPA expenditures constitute waste; and Plaintiff was entitled to attorney fees under a catalyst theory.

## DISCUSSION

1. *Overview of SPA expenditures.*

For the 2009-2010 fiscal year, the Board/Executive Office budgeted $147 million for its own operations, representing about 0.67 percent of the County's $23 billion budget.  Said $147 million budget includes a fund called the Equal Budget Allocation (EBA).  Funds from the EBA are used to pay the Supervisors' office staff salaries, office and travel expenses, and to fund SPAs pursuant to Government Code section 26227.

Government Code section 26227 gives the Board the authority to appropriate and spend funds for social service programs for county residents.[1]  The County uses SPAs to provide funding to organizations to address issues such as hunger, sexual and domestic violence, child abuse, as well as services for the elderly, physically and mentally disabled, and persons affected by HIV/AIDS, cancer and other serious illnesses.  For the 2009-2010 fiscal year, approximately $17 million was allocated to the EBA.  Each of the

---

[1]     Government Code section 26227 provides in relevant part:  "The board of supervisors of any county may appropriate and expend money from the general fund of the county to establish county programs or to fund other programs deemed by the board of supervisors to be necessary to meet the social needs of the population of the county, including but not limited to, the areas of health, law enforcement, public safety, rehabilitation, welfare, education, and legal services, and the needs of physically, mentally and financially handicapped persons and aged persons.  [¶]  The board of supervisors may contract with other public agencies or private agencies or individuals to operate those programs which the board of supervisors determines will serve public purposes."

five Supervisors' offices receives a proportionate share of the EBA. The allocation for the 2009-2010 fiscal year was $3.4 million per supervisorial district.

a. *Delegation by Board of its contracting authority.*

In 1990, the Board formally delegated authority to the County's Chief Administrative Officer (CAO) (now the County CEO) to "execute such contracts and agreements as may be necessary to implement the social programs to be paid from funds appropriated in the Budget for discretionary use by the supervisors, when such programs are to meet the social needs of the population of the County, including but not limited to, the areas of health, law enforcement, public safety, rehabilitation, welfare, education and legal services, and the needs of physically, mentally and financially handicapped persons and aged persons."

In 1992, the Board took additional action, directing that the CAO's "previously delegated contracting authority shall be exercised in the future only when countersigned by the Auditor-Controller and the Executive Officer of the Board."

Further, although not ordered by the Board, every SPA also is reviewed and signed by County Counsel, which is typical for many contracts entered into by the County. Thus, every SPA is signed by *three* County offices (Auditor-Controller, Board's Executive Officer and County Counsel) before the County CEO executes the SPA pursuant to the Board's delegation of authority.

b. *The SPA approval mechanism.*

The SPA process begins with requests from funding from the offices of the five individual Supervisors. After the Board's Executive Officer receives the requests, it analyzes the request and conducts research to determine whether fulfilling the request would serve a social need of County residents. The Board's Executive Officer does not discuss the request with any Supervisors other than the Supervisor's office which submitted the request.

The Board's Executive Officer does not approve a request for SPA funding. The role of the Board's Executive Officer is to evaluate the request and to determine whether

8

the SPA is necessary to meet a social need. If the Board's Executive Officer concludes the funding request satisfies a social need of County residents, the Board's Executive Officer prepares the agreement and forwards it to County Counsel for its review and signature.

County Counsel then reviews the proposed SPAs and will reject SPAs that do not comply with the law. After County Counsel has executed and returned the proposed SPA to the Board's Executive Officer, the agreement is sent to the requesting organization for signature. The requesting organization signs the SPA and sends it back to the Board's Executive Officer.

The Board's Executive Officer then forwards the SPA to the Auditor-Controller for its approval. Once the Board's Executive Officer obtains the proposed SPA with the signature of the Auditor-Controller, the Board's Executive Officer executes the proposed SPA.

Once the proposed SPA has been approved by County Counsel, the recipient organization, the Auditor-Controller and the Board's Executive Officer, it is sent to the County CEO for final approval. The County CEO is vested with the final authority to approve the SPA.

Once the County CEO signs the SPA and returns it to the Board's Executive Officer, the Auditor-Controller issues a check to the recipient organization.

2. *Standard of review*.

The pivotal issue before us is the applicability of the Brown Act, specifically, whether the four signatories to a SPA constitute a legislative body within the meaning of Government Code section 54952, so as to be subject to the Act. As an appellate court, "we 'conduct independent review of the trial court's determination of questions of law.' [Citation.] Interpretation of a statute is a question of law. [Citations.] Further, application of the interpreted statute to undisputed facts is also subject to our independent determination. [Citation.]" (*Harbor Fumigation, Inc. v. County of San Diego Air Pollution Control Dist.* (1996) 43 Cal.App.4th 854, 859.)

9

3. *The Brown Act's purpose, scope and broad construction.*

"Open government is a constructive value in our democratic society. [Citations.]" (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 380 (*Roberts*). The Brown Act (Gov. Code, § 54950 et seq.), adopted in 1953 and since amended, is intended to ensure the public's right to attend the meetings of public agencies. (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 825.) To achieve this aim, the Act requires, inter alia, that an agenda be posted at least 72 hours before a regular meeting and forbids action on any item not on that agenda. (Gov. Code, § 54954.2, subd. (a); *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 555.) The Act thus serves to facilitate public participation in all phases of local government decisionmaking and to curb misuse of the democratic process by secret legislation by public bodies. (*Cohan, supra,* 30 Cal.App.4th at p. 555.)

The Brown Act's statement of intent provides: "In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly. [¶] The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created." (Gov. Code, § 54950; Stats. 1953, ch. 1588, § 1.)

The Brown Act dictates that "[a]ll meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter." (Gov. Code, § 54953, subd. (a).)

The term "legislative body" has numerous definitions, set forth in Government Code section 54952. The question presented is whether the four SPA signatories

10

constitute a legislative body within the meaning of subdivision (b) of Government Code section 54952. This provision states in relevant part: "As used in this chapter, 'legislative body' means: [¶] . . . [¶] (b) A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body." (*Ibid*.)

In determining whether the four SPA signatories are a legislative body within the meaning of the Brown Act, we are mindful the Act should be construed liberally in favor of openness so as to accomplish its purpose and suppress the mischief at which it is directed. (*San Diego Union v. City Council* (1983) 146 Cal.App.3d 947, 955 [construing open-meeting requirements].) This is consistent with the rule that "civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose. [Citations.]" (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313.)

4. *The four SPA signatories are not a legislative body and do not engage in collective decisionmaking within the meaning of the Brown Act.*

The Brown Act contemplates collective action by a legislative body. As relevant here, the Act defines a legislative body as "[a] *commission, committee, board, or other body of a local agency*, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body." (Gov. Code, § 54952, subd. (b), italics added.) Plaintiff seeks to characterize the four signatories to a SPA as a "committee" whose decisionmaking is subject to the Brown Act.

The argument fails because the four SPA signatories do not engage in collective decisionmaking. Rather, as set forth above in some detail, the four SPA signatories act separately in scrutinizing proposed SPAs. Because they deliberate individually as opposed to collectively, their decisionmaking is outside the ambit of the Act.

11

a. *Brown Act applies to collective decisionmaking.*

The Supreme Court's decision in *Roberts, supra,* 5 Cal.4th 363 is instructive. It explained, "the keystone of the Brown Act is the requirement that '[a]ll meetings of the legislative body of a local agency shall be open and public. . . .' ([Gov. Code,] § 54953, subd. (a).) An early case interpreted this language to apply only to formal meetings; an informal ' "fact-finding meeting" ' conducted by members of a city planning commission at a local country club was held not within the scope of the act. (*Adler v. City Council* (1960) 184 Cal.App.2d 763, 767.) The Legislature responded in 1961 with substantial revisions of the act intended to bring informal deliberative and fact-finding meetings within its scope. (*Stockton Newspapers, Inc. v. Redevelopment Agency* [(1985)] 171 Cal.App.3d [95,] 101-102; 42 Ops.Cal.Atty.Gen. 61, 68 (1963); Comment, *Access to Governmental Information In California* (1966) 54 Cal.L.Rev. 1650, 1654; 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 579, p. 788.) At that time, [Government Code] section 54952.6 was added to provide that the deliberative action covered by the act included '*a collective decision* made by a majority of the members of a legislative body, *a collective commitment or promise* by a majority of the members of a legislative body to make a positive or a negative decision, or *an actual vote* by a majority of the members of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance.' (Stats. 1961, ch. 1671, § 3, p. 3637.)" (*Roberts, supra,* 5 Cal.4th at p. 375, italics added.)

After "the 1961 revisions, the courts have applied provisions of the act to informal deliberative action, *but have always required that some sort of collective decisionmaking process be at stake. Thus the action of one public official is not a 'meeting' within the terms of the act; a hearing officer whose duty it is to deliberate alone does not have to do so in public. (Wilson v. San Francisco Mun. Ry.* (1973) 29 Cal.App.3d 870, 878-879.) As the Court of Appeal in *Wilson* reasoned, because the act uniformly speaks in terms of collective action, and because the term 'meeting,' as a matter of ordinary usage, conveys the presence of more than one person, *it follows that under* [*Government Code*] *section*

12

*54953, the term 'meeting' means that 'two or more persons are required in order to conduct a "meeting" within the meaning of the Act.'* (29 Cal.App.3d at p. 879.)" (*Roberts, supra,* 5 Cal.4th at pp. 375-376, italics added.)

Another court "has characterized the term as referring to a '*collective decision-making process*' and as a 'deliberative *gathering*.' (*Sacramento Newspaper Guild, supra*, 263 Cal.App.2d at pp. 47, 48, italics added.) More recently the Court of Appeal has opined that the term 'comprehends informal sessions at which a legislative body *commits itself collectively* to a particular future decision concerning the public business.' (*Stockton Newspapers, Inc. v. Redevelopment Agency, supra,* 171 Cal.App.3d at pp. 100, 102, italics added; see also 7 Witkin, Summary of California Law, *supra,* Constitutional Law, § 579, p. 788.) Another court has declared that the act applies to informal *collective acquisition* and exchange of facts before a decision is reached. (*Rowen v. Santa Clara Unified School Dist., supra,* 121 Cal.App.3d at p. 234 [act prohibits closed session of school board to consider qualifications of real estate agents before public session at which agents would receive contract to dispose of public property].)" (*Roberts, supra*, 5 Cal.4th at p. 376, certain italics added.)

In sum, it is collective decisionmaking by a legislative body, not the solitary decisionmaking of an individual public official, which is subject to the Brown Act.

b. *No collective deliberations in approval of proposed SPAs*.

As set forth above, proposed SPAs are individually scrutinized by the Board's Executive Officer, County Counsel, Auditor-Controller and ultimately by the County CEO, and the approval of all four officials is required. However, the four signatories do not collectively decide to approve an SPA. Rather, a proposed SPA is reviewed in sequence by the four signatories, for issues within each one's purview. The Brown Act only applies to meetings of legislative bodies. (Gov. Code, §§ 54952.2, 54953.) The four SPA signatories do not constitute a legislative body and do not deliberate collectively in approving a SPA. Therefore, Plaintiff's Brown Act claim is meritless.

13

Of course, "the intent of the Brown Act cannot be avoided by subterfuge; a concerted plan to engage in collective deliberation on public business through a series of letters or telephone calls passing from one member of the governing body to the next would violate the open meeting requirement. (See, e.g., *Stockton Newspapers, Inc. v. Redevelopment Agency, supra,* 171 Cal.App.3d at p. 102; 65 Ops.Cal.Atty.Gen. 63, 65 (1982).)" (*Roberts, supra*, 5 Cal.4th at pp. 376-377.) *Stockton* held "the alleged participation by defendants, a majority of the legislative body of the redevelopment agency, in a series of one-to-one nonpublic and unnoticed telephone conversations with the agency's attorney for the commonly agreed purpose of collectively deciding to approve the transfer of ownership in redevelopment project property constitutes a 'meeting' at which 'action' was taken in violation of the Brown Act." (*Stockton, supra*, 171 Cal.App.3d at p. 105.)

Here, unlike *Stockton*, there is no end run around the Brown Act. The four SPA signatories, in sequence, each make their own determination with respect to a proposed SPA. Because the SPA approval process does not involve collective deliberation, the concerns presented in *Stockton* are absent.

5. *No merit to claim the Board improperly delegated its authority to enter into SPAs.*

Plaintiff contends the Board is prohibited from delegating its authority under Government Code section 26227 to appropriate and spend funds for social services, or alternatively, that the delegations lack adequate safeguards and guidelines. The arguments are unavailing.

a. *Government Code authorizes delegation of authority by Board.*

Plaintiff contends Government Code section 26227 prohibits the Board from delegating its authority with respect to SPAs because the statute provides, "*The board of supervisors of any county* may appropriate and expend money . . . to meet the social needs of the population . . . ." (Italics added.) However, nothing in Government Code

14

section 26227 prohibits a board of supervisors from delegating its contracting authority with respect to SPAs.

Moreover, Government Code section 23005 states: "A county may exercise its powers only through the board of supervisors *or through agents and officers acting under authority of the board or authority conferred by law*." (Italics added.)

We conclude the Government Code permits a board of supervisors to delegate its authority to enter into SPAs with recipient social service organizations.

b. *A legislative body may delegate administrative authority.*

Moreover, delegation by legislative bodies is essential to the basic ability of government to function. "As long ago as 1917 [the Supreme Court] recognized that legislative bodies have neither the resources nor the expertise to deal adequately with every minor question potentially within their jurisdiction. (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 383 (*Kugler*), citing *Gaylord v. City of Pasadena* (1917) 175 Cal. 433, 436.)

In 1937, the Supreme Court observed, " ' "The great social and industrial evolution of the past century, and the many demands made upon our legislatures by the increasing complexity of human activities, have made essential the creation of these administrative bodies and the delegation to them of certain powers. Though legislative power cannot be delegated to boards and commissions, the legislature may delegate to them administrative functions in carrying out the purpose of a statute and various governmental powers for the more efficient administration of the laws." ' " (*Stanislaus Co. etc. Assn. v. Stanislaus* (1937) 8 Cal.2d 378, 390.) Only "in the event of *a total abdication of* [*legislative*] *power,* through failure either to render basic policy decisions or to assure that they are implemented as made, will this court intrude on legislative enactment because it is an 'unlawful delegation,' and then only to preserve the representative character of the process of reaching legislative decision." (*Kugler, supra*, 69 Cal.2d at p. 384, italics added.)

15

The nondelegation doctrine is " 'rooted in the principle of separation of powers that underlies our tripartite system of Government.' " (*Samples v. Brown* (2007) 146 Cal.App.4th 787, 804.)  An unconstitutional delegation of legislative power occurs when a legislative body confers upon an administrative agency unrestricted authority to make fundamental policy decisions.  (*Ibid*.)

The nondelegation doctrine serves "to assure that 'truly fundamental issues [will] be resolved by the Legislature' and that a 'grant of authority [is] . . . accompanied by safeguards adequate to prevent its abuse.'  [Citations.]  This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues.  It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions." (*Kugler, supra,* 69 Cal.2d at pp. 376-377.)[2]

Thus, the real issue is not whether the Board can lawfully delegate its authority to execute SPAs to the County CEO, but whether, in doing so, the Board has retained sufficient power and has established adequate safeguards.

c. *The Board's retention of control over fundamental policy decisions.*

The approval of a county budget is a fundamental legislative function and the power and obligation to enact a county's budget is vested by law in the board of supervisors.  (*County of Butte v. Superior Court* (1985) 176 Cal.App.3d 693, 698, citing Gov. Code, § 29088.)

In contrast, the execution of SPAs with social service providers, utilizing funds which have been appropriated to the EBA, is not a fundamental policy decision.  The

---

[2]    In *Kugler,* the issue presented was whether an initiative ordinance providing for parity of firefighters' salaries constituted an improper delegation of legislative power. (69 Cal.2d at pp. 373-374.)  "Once the legislative body has determined the issue of policy, i.e., that the Alhambra wages for firemen should be on a parity with Los Angeles, that body has resolved the 'fundamental issue'; the subsequent filling in of the facts in application and execution of the policy does not constitute legislative delegation.  Thus the decision on the legislative policy has not been delegated; the implementation of the policy by reference to Los Angeles salaries is not the delegation of it." (*Id.* at p. 377.)

16

"fact that a third party, whether private or governmental, performs some role in the application and implementation of an established legislative scheme [does not] render the legislation invalid as an unlawful delegation." (*Kugler, supra*, 69 Cal.2d at pp. 379-380.)

Here, the Board has retained its budgeting authority. There has been no delegation in that regard. The Board has delegated to the County CEO only its authority to execute SPAs with social service providers, using funds which the Board already has appropriated to the EBA.

Further, the Board expressly retained authority to modify or rescind its delegation of SPA authority to the County CEO. At the inception in 1990, the Board specified the delegation of SPA authority would remain in place "[u]ntil otherwise ordered by the Board." Thereafter, in 1992, the Board directed that the "previously delegated contracting authority shall be exercised in the future only when countersigned by the Auditor-Controller and the Executive Officer of the Board."

Clearly, there has been no "total abdication" by the Board of its legislative power. (*Kugler, supra*, 69 Cal.2d at p. 384.)

> d. *The SPA approval process has adequate safeguards.*

The language of the original delegation in 1990 authorized the then CAO to enter into SPA agreements only "when such programs are to meet the social needs of the population of the County, including but not limited to, the areas of health, law enforcement, public safety, rehabilitation, welfare, education and legal services, and the needs of physically, mentally and financially handicapped persons and aged persons." This language is consistent with Government Code section 26227, which gives the Board the authority to appropriate and spend funds for social service programs for county residents.

In 1991, new guidelines were added, providing, inter alia, that no more than 20 percent of the recipient organization's budget could be spent on administrative expenses. The following year, as indicated, the Board further required that SPAs also be signed by the Auditor-Controller and Board's Executive Officer.

17

Moreover, each proposed SPA undergoes multiple layers of scrutiny. The SPA process begins with requests from funding from the offices of the five individual Supervisors. After the Board's Executive Officer receives the requests, it analyzes the request and conducts research to determine whether fulfilling the request would serve a social need of County residents. If the Board's Executive Officer so finds, that office prepares the agreement and forwards it to County Counsel for its review and signature. County Counsel then reviews the proposed SPA for legal compliance. The SPA also requires approval by the Auditor-Controller. Once those approvals have been obtained, the Board's Executive Officer executes the proposed SPA. Thereafter, the SPA is transmitted to the County CEO for final approval. Once SPAs are approved and funded they are posted online on the County's website, on a quarterly basis.

Clearly, the County has put in place "an effective mechanism to assure the proper implementation of its policy decisions." (*Kugler, supra*, 69 Cal.2d at p. 377.)

In sum, we conclude the Board properly delegated to the County CEO its authority to enter into SPAs with social service providers.[3]

6. *No merit to Plaintiff's cause of action for waste and related arguments*.

A taxpayer may, in his or her representative capacity, sue concerning fraud, collusion, ultra vires, or a failure on the part of the governmental body to perform a duty specifically enjoined. (*Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035, 1046.) "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein." (Code Civ. Proc., § 526a.)

---

[3] It is unnecessary to address the County's argument the Supervisors have legislative immunity against Plaintiff's claim challenging the SPA delegation.

18

As the trial court found, the gravamen of Plaintiff's waste claim appears to be that every single expenditure of SPA funds constitutes waste because the County failed to comply with the Brown Act. Given our conclusion the SPA approval process is not subject to the Brown Act, the waste claim, insofar as it is predicated on alleged violations of the Brown Act, is meritless.

Likewise, to the extent Plaintiff's waste claim is predicated on a theory of improper delegation by the Board of SPA authority to the County CEO, the claim is meritless.

The appellant's opening brief also lists, without discussion, 13 other legal theories as a basis for his waste claim, and faults the County for failing to dispose of each of those theories on its motion for summary judgment. The theories of illegality include: violation of the County Budget Act (Gov. Code, § 29000 et seq.); State Controller Regulations "State of California – Accounting Standards and Procedures for Counties"; the First Amendment to the United States Constitution; Generally Accepted Accounting Principles; and the Governing Accounting Standards Board standards. "On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court. [Citation.] . . . '[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed.' [Citation.]" (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230.)

Further, Plaintiff's arguments near the end of his opening brief, pertaining to burden shifting on summary judgment and other issues, are not properly developed and require no discussion.

19

7.  *Plaintiff's contention the trial court erred in denying his motion for catalyst attorney fees is not properly before this court; because the postjudgment order was not appealed, it is final and no longer reviewable.*

Lastly, Plaintiff contends the trial court erred in denying his motion for $1,949,606 in attorney fees pursuant to the catalyst theory.[4]  This contention is not properly before us because Plaintiff did not appeal the postjudgment order denying his attorney fee motion.

"A postjudgment order awarding [or denying] attorney fees is separately appealable.  (Code Civ. Proc., § 904.1, subd. (a)(2); *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46.)  The failure to appeal an appealable order ordinarily deprives the appellate court of jurisdiction to review the order.  (*Praszker*, at p. 46.)  *However, when the judgment awards attorney fees but does not determine the amount, the judgment is deemed to subsume the postjudgment order determining the amount awarded, and an appeal from the judgment encompasses the postjudgment order.  (Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 998.)"  (*R. P. Richards, Inc. v. Chartered Construction Corp.* (2000) 83 Cal.App.4th 146, 158; see generally, 4 Cal. Jur. 3d (2014) Appellate Review, § 86.)

Here, the pertinent chronology is as follows.

On November 5, 2012, following the grant of summary judgment in favor of the County, the trial court entered judgment for the County and awarded the County costs in the amount of $21,152.01, but denied the County any recovery of attorney fees.

---

[4]     "Under the catalyst theory, attorney fees may be awarded even when litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation. . . .  In order to be eligible for attorney fees under [Code of Civil Procedure] section 1021.5, a plaintiff must not only be a catalyst to defendant's changed behavior, but the lawsuit must have some merit . . . and the plaintiff must have engaged in a reasonable attempt to settle its dispute with the defendant prior to litigation."  (*Graham v. DaimlerChrysler Corp*., *supra,* 34 Cal.4th at pp. 560-561.)  Plaintiff contended he was a catalyst to the County's changed behavior in that, inter alia, two of the five Supervisors now place their SPAs in excess of $1,000 on the Board's agenda for Brown Act approval.

20

On January 3, 2013, Plaintiff filed a timely notice of appeal, specifying the November 5, 2012 judgment.

On January 11, 2013, *after* Plaintiff filed notice of appeal from the judgment, Plaintiff filed the subject motion for catalyst attorney fees.

On March 15, 2013, the trial court heard and denied Plaintiff's motion for attorney fees.

Plaintiff did not file notice of appeal from the March 15, 2013 postjudgment order denying his motion for attorney fees. However, Plaintiff asserts the March 15, 2013 order is properly before this court because his notice of appeal from the November 5, 2012 judgment embraces the March 15, 2013 order. He is mistaken. The November 5, 2012 judgment did not provide for attorney fees to Plaintiff in an amount to be determined later. In fact, the judgment did not award anything to Plaintiff, who was the losing party. To the contrary, the judgment, which was in favor of the County, awarded the County costs of suit in the amount of $21,152, but denied the County any recovery of attorney fees. Because the November 5, 2012 judgment did not award attorney fees to Plaintiff in an amount to be determined later, the January 3, 2013 notice of appeal from said judgment cannot be construed to embrace the March 15, 2013 order.

In sum, the March 15, 2013 order was separately appealable, was not appealed, and is long since final. Plaintiff's failure to appeal said order eliminates the denial of catalyst attorney fees as an issue on appeal.[5]

---

[5]     Plaintiff asserts the parties "agreed" through counsel that an additional notice of appeal was not necessary. However, the timely filing of a notice of appeal is a jurisdictional prerequisite (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 113) and appellate jurisdiction cannot be conferred by the consent or stipulation of the parties (*Estate of Hanley* (1943) 23 Cal.2d 120, 123), making any purported agreement between the parties an irrelevancy.

Moreover, the record cited by Plaintiff does not reflect such an agreement. Rather, at a hearing on February 8, 2013, the trial court stated, "there are two or three different ways that are employed by different parties in these cases amending judgments, filing a separate appeal on issues related to such things as attorney's fees and costs, and then

21

## DISPOSITION

The November 5, 2012 judgment is affirmed.  Respondents shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**

                                                  KLEIN, P. J.

We concur:

        KITCHING, J.

        ALDRICH, J.

---

asking the Court of Appeal to consolidate.  *I have no idea.  So I can't give you any guidance on it.*"  (Emphasis added.)  The attorney for the County then added "We'll discuss it and I think between the two of us, we can figure out how to do it so it's sensible for all."  In sum, leaving aside the fact that parties cannot confer jurisdiction on the Court of Appeal by stipulation, the record does not reflect an agreement between the parties that a separate notice of appeal from the March 15, 2013 order was unnecessary.