Filed 1/18/24  Marriage of D.S. and B.S. CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of D.S. and B.S. | |
| D.S.,<br><br>    Appellant,<br><br>v.<br><br>B.S.,<br><br>    Respondent. | A167778<br><br>(Marin County<br>Super. Ct. No. FL2200449) |

Appellant D.S. (mother), appearing in propria persona, appeals from a trial court order denying her request for a domestic violence restraining order (DVRO) against respondent B.S. (father), who also appears in propria persona, under the Domestic Violence Prevention Act (Act) (Fam. Code, § 6200 et seq.).[1]  She claims the court "ignored the evidence and misapplied the law" in numerous respects and displayed bias and hostility toward her. She therefore seeks reversal of the order denying a DVRO, as well as later orders that were dependent on that order, and assignment of the matter to a different judge on remand.

---

[1] We granted mother's motion for the parties to be referred to by their initials only.  All further statutory references are to the Family Code unless otherwise noted.

1

We reverse the order denying the DVRO. Although the trial court could have rationally concluded that a DVRO was unnecessary, its ruling was based on the incorrect premise that father's conduct could not constitute abuse unless it put "a reasonable person in apprehension of imminent serious bodily injury."[2] We also conclude that it is "in the interests of justice" for a different judge hear the matter on remand. (Code Civ. Proc., § 170.1, subd. (c).) Finally, we decline to reverse later orders from which mother did not appeal, although those orders are subject to reversal or modification on remand.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.    *Proceedings Leading to the DVRO Request*

Mother and father married in 2000. They have four children together, including two teenaged minors: a boy born in 2006 and a girl born in 2008. Father is an entrepreneur and writer, and mother is a Yale-trained lawyer who started practicing in 2020. The parties agree that mother's career causes her public exposure, including because of her participation in a prominent out-of-state case against a major company (the out-of-state litigation).

Mother filed a petition for legal separation in February 2022, and that April she amended the petition to seek a divorce. She sought joint legal custody and sole physical custody of the minor children. That August, after father did not respond to the petition, mother asked that a default be entered

---

[2] In light of this disposition, we deny father's motion to dismiss the appeal as frivolous. We also deny father's motion for sanctions, mother's motion for sanctions, mother's motion to strike father's sanctions motion, and mother's motion to have father declared a vexatious litigant.

2

against him.  In an accompanying attachment, mother explained why she should be awarded sole physical custody of the children, including that father had left them at home "for long periods of time without meals or supervision" and "was abusive toward [her] throughout [their] marriage."

The trial court granted mother's request for entry of default, and a judgment of dissolution was entered terminating the marriage as of September 14, 2022.  Mother and father were awarded joint legal custody of the minor children, and mother was awarded sole physical custody.  Father had visitation every other weekend.

In mid-October 2022, father filed a request to change the custody order to give him joint physical custody.  In an accompanying declaration (father's custody declaration), he inaccurately claimed that mother did not seek sole physical custody until she sought entry of default, and he claimed he did not have "adequate time to respond."  A month later, father withdrew his request to change the custody order.  He later claimed this was because mother threatened to "respond aggressively and seek to defame [him] if [he] did not concede custody."

A few days after father withdrew the custody-change request, mother, who apparently did not receive notice he had done so, filed a declaration opposing it (mother's custody declaration).  She gave several reasons why father should not have physical custody of the minor children, including his abusive behavior toward her throughout the marriage.  She provided numerous examples of such behavior, including threats to physically harm her, attempts to harm her career and otherwise financially control her, and instances of emotional abuse.  She submitted supporting documentary evidence, including text messages and other written communications.

### B.    *Proceedings on the DVRO Request*

On December 14, 2022, mother filed the DVRO request at issue.  She stated that as part of an "[o]n-going pattern lasting years," father caused her "emotional and physical" harm.  She primarily relied on incidents discussed in her custody declaration and again submitted documentary evidence.  She now sought a DVRO because she was worried father would retaliate against her for outlining his abuse in her custody declaration, since "his prior threats to her [were related] to the prospect of her making public statements about his conduct."

Father opposed the DVRO request, stating that he did "not agree to the facts as stated by [mother]."  As had mother, he submitted many written communications between the two.  In an accompanying declaration, he averred, "In 21 years of marriage, I have never struck, hit, slapped, or engaged in any form of violence with [mother]."  He also denied verbally abusing or harassing her, and he specifically denied threatening "physical violence" or "harm [to] her public or professional reputation."  Father claimed that mother sought a DVRO in retaliation for his request to change the custody order, and he claimed she told him "her new ambition is to become a domestic violence advocate to besmirch [his] character."

Father further stated that he had almost no contact with mother since the divorce and she was the one harassing him, including by threatening to release recordings she made of conversations between them if he did not start paying child support.  She had also threatened to call the police on occasions when it was unwarranted.  Once, in July 2022, she had "barged in [to his] home" and said she would call the police if he did not buy groceries for the children.  Another time, as mother admitted, she threatened to call the police

4

because father drove their daughter and her friends in a vehicle without car insurance.

The trial court issued a temporary DVRO pending a hearing, which occurred over three days in February and March 2023. Both parties were represented by counsel, except father appeared in propria persona the last day. Mother and father testified, and mother submitted additional evidence of their interactions.

Mother claimed that father first threatened her with physical violence in late December 2020 (the December 2020 incident).[3] According to her, the two were talking on the phone about their relationship, including father's belief she had cheated on him. Mother told him they should "have an open and honest conversation with the children" about the issue, at which point he responded that "if [she] dared to do that, he would bash [her] face in." In his testimony, father seemed to admit to saying this, although he claimed "it was a sarcastic remark made over the phone to deter her from coming home and telling all of [his] children, with their friends there, that she cheated on [him]."

Mother also claimed that a few weeks after this incident, while she was out with a friend, father called her and "started violently shouting and asking [her] to come home." Mother became "distraught, subsequently developed severe chest pains," and went to the emergency room. Several months later, in October 2021, father's conduct again distressed her enough that she went to the emergency room. On that occasion, father had attempted "to break [mother] psychologically by mocking the fact that [she] was raped as a

---

[3] Our discussion of the incidents supporting mother's DVRO request is drawn from both the parties' filings and their testimony at the hearing.

teenager and actively trying to get [her] to remember the rape to inflict current emotional distress."

On October 31, 2021, mother "confronted [father] about his escalating aggression" and "told [him] that he was scaring [her]." According to mother, father responded that "he could have physically 'snapped' and killed [her]" for "humiliating him" if she had followed through on her December 2020 statement that she wanted to talk the children about their relationship. At the DVRO hearing, mother introduced a recording of this conversation. On the recording, father admitted to saying during the December 2020 incident that he would "bash [her] face in," and he said he would have physically "snapped" if she talked to the children at that time. When mother said, "You could kill me by . . . bashing my face in," father responded, "I could," but he continued by denying the "bash" statement constituted a threat to kill her.

Mother also described father's attempts to exercise economic control over her, including by threatening her professional reputation. She pointed to his custody declaration, claiming that in it he "implicated [her in] . . . work-related misconduct[,] . . . continu[ing] a prior pattern of specific threats to falsely frame [her] with misconduct to destroy [her] new legal career and get [her] disbarred." In that declaration, father averred that mother "disclosed evidence" in the out-of-state litigation "to an unauthorized party," leading to unwanted press coverage. Thus, father claimed, "[i]n just the first year of [her] practicing law, [mother] compromised her client and violated her ethical obligations as an officer of the court. [She] would not think twice about manipulating a family court in Marin County to achieve her objectives."

According to mother, father threatened "to frame [her] with leaking confidential client documents" related to the out-of-state litigation in late

6

November 2021, prompting her to call 911. She explained that documents from the litigation had indeed leaked, and she called 911 because she thought father's accusation could expose her to jail time and she wanted to protect herself by immediately reporting his threats. Father's response was that mother had a "hypersensitivity to personal conflicts" due to her childhood trauma, and she had admitted to him that she "use[d] the threat of calling the police to make [him] feel fear even though she never felt that she was ever in any physical danger from [him]."

Finally, mother focused on an alleged incident that occurred in late March 2022 (March 2022 incident). That night, father, who appeared angry, went to the garage to use his punching bag. According to mother, "each time he punched the bag, the house inside shook." When father returned, he asked mother "in a menacing tone . . . to look at his 'bloody knuckles.' " After she repeatedly refused to look, he "started to reveal the reason for his anger," that she and some of their children "had reached out to an aunt, a psychiatrist, for support." Father "asked if [mother] understood that men 'snap' " and referred to Will Smith's attack of Chris Rock at the Oscars, which occurred earlier the same night.

Father then told mother that she would "soon become 'disposable' to him." Mother interpreted this statement in light of "a threatening comment he had made a year[] earlier." When mother was in law school, the family moved to Connecticut, and they lived there for several years. In 2019, a man who lived in the same town as they had "allegedly killed his (almost ex) wife and mother of five children" and "then chopped up and disposed of his wife's body parts" (the Connecticut murder). According to mother, father "made a chilling and casual comment to [her] at the time: that women ought to know better than to humiliate a man in [a] divorce."

7

Father described the March 2022 incident very differently. He explained that he regularly boxed "at high intensity," and he "made no threats at all to [mother] pertaining to [his] bloody knuckles from a routine workout." He flatly denied threatening mother's life, characterizing their conversation as "a civil discussion about the reasons why Will Smith 'snapped' the way he did during the Academy Awards." Father agreed he had referred "to how humiliated . . . Smith must have felt," but he never "tr[ied] to insinuate to [mother] that [he] would 'snap' at [her] like . . . Smith 'snapped' at Chris Rock." Father also claimed he used the word "disposable" in reference to their marriage. Finally, father pointed to a text message mother sent him two days later, in which she told him he was welcome to have dinner with the family, as evidence she was not actually afraid of him.

Mother did not allege in either the DVRO request or her direct testimony that father ever sexually assaulted her. On cross-examination, after father's counsel asked her to confirm that father "never actually physically harmed [her]," she declined to do so, stating, "I could have included a couple of instances of sexual assault that I chose not to include in my statement." She elaborated that the last time she and father had sexual intercourse, in November 2021, she participated because she "was terrified of him." She claimed she did not include the incident in the DVRO request because she had not known "that sex under fear was even coercion under the law."

## C. The Trial Court's Ruling

At the conclusion of the hearing on March 9, 2023, the trial court denied mother's request for a DVRO, finding that she had not met her burden of proof. After stating that the case was "very bizarre," the court identified the applicable law as follows:

"So, I will start with this: The court is authorized pursuant to . . . [section] 6203 to issue [DVROs], and I understand that [DVROs] also include acts of non-violence: things like stalking, and excessive texting, and annoying behavior and behavior that disturbs someone's mental well-being. That can all be used as a basis to justify the issuance of a [DVRO].

"The conduct must place a reasonable person—let me reiterate—a reasonable person in apprehension of imminent serious bodily injury from that person or acts caused by that person. So you have to look at reasonable. What would most people do? What is a reasonable person going to do? How is a reasonable person going to respond?"

The trial court then discussed its view of various incidents on which mother relied to seek a DVRO. Father's statement that he would "bash in [her] face" during the December 2020 incident occurred after she threatened "to tell the children's friends about [his] affairs," which was "a horrible thing to do" and involved "utter humiliation."[4] The court opined that mother made this threat "in order to entice a response from [father], to enrage him," and "she lit that fire." Although father was later recorded admitting he threatened to hurt mother during the December 2020 incident, the court believed she "contrived" the later conversation and "was trying to get [father] to say what he said."

In its ruling, the trial court did not address mother's claim that father had mocked her for being raped when she was a teenager. When mother testified about that incident, however, the court responded, "That's horrible trauma. But you're accusing him of putting you in the hospital. In domestic violence court, when I hear something like that, . . . I am used to when someone puts you in the hospital, it's because of a beating; not when someone

---

[4] Actually, according to father, mother threatened to tell the children about *her* cheating on *him*.

9

uses harsh words that we feel the need to . . . check yourself in with some kind of heart condition."

As to the March 2022 incident, mother's claim that father's boxing caused the house to shake was "consistent with the overexaggeration presented by [her] throughout this case." The trial court appeared to discount mother's interpretation of the statement that she was "disposable" in light of the Connecticut murder, suggesting this was another instance of "bizarre facts com[ing] into play in this case." The court was also unconvinced by mother's claim that father threatened her with professional harm, stating there was "no evidence that he attempted to disbar her" and "no proof" he played a role in leaking documents in the out-of-state litigation.

Turning to mother's claim of sexual assault, the trial court found it "very troubling" that mother raised the issue "only when she was under cross-examination." The court said, "If [mother] was a victim of sexual assault, it should have been in the moving papers, it seems to me[,] because that's pretty awful. And the court is familiar with doing this for almost six years[.] When people suffer from domestic violence and sexual assaults, it's in the papers. . . . It's not what they use in defense of their argument during cross-examination." To the court, mother's late raising of the issue "seem[ed] manipulative" and was "consistent with how this case goes."

The trial court criticized mother in other respects as well. Referring to her threat to call the police about father driving without insurance, the court said, "Law enforcement are busy folks. They are really busy worrying about real things that impact real people, hard-working folks, not a mother who is concerned about a minivan that is not ensured." The court continued, "This is a Yale Law School graduate, who is making these kind of threats to contact police. No reasonable person would do that." The court also downplayed her

10

concern about food not being at father's house for the children, including their son, "a 16-year-old who weighs 170 pounds. He's a football player and that wasn't enough food for him."

Finally, the trial court questioned mother's desire for child support, which was also a subject of discussion at the DVRO hearing. The court stated that mother had "not disclose[d] to the court her income level," incorrectly believing she first revealed it during that hearing.[5] The court then implied that mother was making too much money to request child support from father, although the court also said it did not believe his claim that he had no income.

## II.
### DISCUSSION

#### A.     *The Trial Court Applied the Wrong Legal Standard in Denying the DVRO Request.*

Mother contends the trial court misapplied the Act in several respects, including by minimizing the evidence of father's threats to her. She also contends she was denied her due process right to a fair and impartial decisionmaker, based on the trial judge's alleged bias and hostility toward her case. We need not resolve all of mother's claims of error, because we agree the court prejudicially erred in evaluating whether father's past behavior qualified as "abuse" under the Act.

The purpose of the Act "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in

---

[5] In fact, in conjunction with her divorce petition, mother submitted an income and expense declaration that revealed her income in 2021 was over $600,000. She affirmed this at the DVRO hearing, although she represented that her income was now "down to zero" and she was "spending from savings." Father, who never filed financial disclosures, also claimed he currently had no income.

11

the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) To effectuate this purpose, a trial court may issue a DVRO if the evidence "shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).) The Act "should 'be broadly construed in order to accomplish [its] purpose' of preventing acts of domestic violence." (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115.)

Under the Act, "abuse" includes, but "is not limited to[,] the actual infliction of physical injury or assault." (§ 6203, subd. (b).) The term is defined as "mean[ing] any of the following": (1) "intentionally or recklessly caus[ing] or attempt[ing] to cause bodily injury"; (2) "[s]exual assault"; (3) "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another"; and (4) "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a).) In turn, section 6320 provides that a court may enjoin a party from a variety of behavior, including "threatening, sexually assaulting, . . . harassing, . . . or disturbing the peace of the other party." (§ 6320, subd. (a).) The phrase " 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).)

Generally, we review an order denying a DVRO for abuse of discretion. (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264.) "But the question whether the trial court applied the correct legal standard in exercising its discretion is a question of law requiring de novo review. [Citation.] If the court's decision to deny a [DVRO] request is influenced by an erroneous understanding of the law, the court has not properly exercised its discretion under the law." (*Michael M. v. Robin J.* (2023) 92 Cal.App.5th 170, 179.)

We agree with mother that the trial court's "view of what constitutes abuse [was] too narrow." The trial court correctly acknowledged that "abuse" justifying issuance of a DVRO includes "acts of non-violence," including "behavior that disturbs someone's mental well-being." (See §§ 6203, subd. (a)(4), 6320, subds. (a), (c).) But the court then incorrectly stated that "[t]he conduct must place a reasonable person . . . in apprehension of imminent serious bodily injury." Conduct causing such apprehension is one type of abuse under section 6203, but it is not the only one. Separately, "behavior that has been or could be enjoined pursuant to Section 6320" also qualifies as "abuse" (§ 6203, subd. (a)(4)), and section 6320 covers a wide range of conduct with no requirement that it place a reasonable person in apprehension of imminent serious bodily injury. (See § 6320, subd. (a).) If non-violent conduct was required to cause such apprehension to constitute "abuse," then section 6203, subdivision (a)(4), would be "render[ed] . . . meaningless as to this form of conduct." (*Vinson v. Kinsey* (2023) 93 Cal.App.5th 1166, 1175–1176 (*Vinson*) [rejecting argument that "threatening" another under section 6320 must cause reasonable fear of serious bodily injury to constitute "abuse"].)

We also conclude the error was prejudicial. If a trial court applies the wrong legal standard in ruling, we may nonetheless affirm if we determine there is no reasonable probability the court would have reached a more favorable result had it applied the correct standard. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504 & fn. 11 [addressing denial of application to terminate DVRO].) But here, the trial court dismissed most of father's alleged behavior as grounds to grant a DVRO, although that behavior could qualify as "abuse" even if it did not cause mother to reasonably fear serious bodily harm. (See *Vinson*, *supra*, 93 Cal.App.5th at p. 1176 ["threats that do

13

not directly refer to physical violence or cause reasonable fear of bodily harm may still constitute harassment or disturbing the peace of the recipient"].)

To be sure, even if some of father's conduct did meet the definition of "abuse," the trial court was not thereby required to grant a DVRO: The purpose of such an order "is not to punish past conduct, but to 'prevent acts of domestic violence [and] abuse' from occurring in the future." (*In re Marriage of F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 117, quoting § 6220.) Although the court could have rationally concluded that a DVRO was unnecessary, we cannot say there is no reasonable probability of a different result had it evaluated the evidence under the proper standard. Thus, reversal is required, and the matter must be "remand[ed] for reconsideration of [mother's] request if she chooses to pursue it under presently existing circumstances." (*Vinson*, *supra*, 93 Cal.App.5th at p. 1180.)

Mother also claims that if we reverse the order denying the DVRO request, we must also reverse the trial court's subsequent orders granting father attorney fees and awarding father joint physical custody, because the later orders "were dependent on [the] DVRO ruling." She offers no authority to suggest this appeal encompasses these orders, from which she has not appealed. (See *Golightly v. Molina* (2014) 229 Cal.App.4th 1501, 1520 [order of attorney fees is separately appealable]; *Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1377 [same for child custody determinations after final judgment].) Although we do not have jurisdiction over them, that does not mean they will stand. Rather, on remand the trial court should reverse any orders that necessarily depended on the DVRO denial. (See, e.g., *Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284 [where appellant obtained reversal of judgment but did not appeal order of attorney fees, appellate court lacked jurisdiction to reverse later order but noted trial court should do so].)

*B.	A Different Judge Shall Hear the Matter on Remand.*

Mother also requests under Code of Civil Procedure section 170.1, subdivision (c), that a different judge be assigned to consider the matter on remand.  We grant her request.

Code of Civil Procedure section 170.1, subdivision (c), provides that "[a]t the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."  Disqualification under this provision does not require a showing of actual bias.  (*People v. LaBlanc* (2015) 238 Cal.App.4th 1059, 1079.)  Rather, it is warranted "when necessary to dispel the appearance of bias" (*ibid.*), which exists when "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."  (§ 170.1, subd. (a)(6).)

Here, several circumstances suggest that further proceedings should be held before a different judge to dispel any appearance of bias.  To begin with, the trial judge seemed unduly focused on certain aspects of this matter.  Above, we have quoted only a couple of the over 20 times he characterized the case or details of it as "bizarre."  This refrain could give a reasonable person the impression that the judge took mother's claims of abuse less seriously because they peripherally involved unusual facts, such as the Connecticut murder and the out-of-state litigation.

A similar impression could be created by the trial judge's comments involving the parties' financial status.  For example, when mother first stated at the DVRO hearing that her income the year before was around $600,000, the trial judge responded, "Okay.  So this is a case of privilege and entitlement."  He continued, "Real life's hard.  There are a lot of people who

15

struggle, who struggle to make a living every day. [¶] . . . [¶] And they come into court with these serious issues. And then there's you guys." Later, in addressing mother's recording of her conversations with father, the judge stated, "You know, bad actors, both of you. . . . [T]his is the price of privilege. This is how privilege and how people conduct themselves, apparently, because this is not a normal domestic violence case." A reasonable person could believe the judge discounted mother's claims because he perceived her as wealthy.

These comments were made in the context of the trial judge's unduly restricted view of what constitutes "abuse" under the Act. We recognize that "[m]ere judicial error does not establish bias" and generally does not warrant a judge's replacement on remand. (*People v. LaBlanc*, *supra*, 238 Cal.App.4th at p. 1079; *People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562.) But the trial judge not only incorrectly required mother to show father's conduct caused her a reasonable fear of serious physical harm, as discussed above, he also minimized her claimed emotional distress, such as when he said he was used to domestic violence victims going to the hospital because of "a beating," not "harsh words."

Mother may have exaggerated and overreacted to some of father's behavior, and the trial judge was entitled to find mother was not credible or to decide a DVRO was unnecessary. But mother presented evidence that father threatened her with significant physical and professional harm, and on remand further proceedings should be heard before a different trial judge to dispel any appearance of bias. We express no opinion on what the outcome of those proceedings should be.

16

## III.
### DISPOSITION

The March 9, 2023 order denying appellant's request for a DVRO is reversed, and the matter is remanded for the trial court to reconsider whether to issue a DVRO if appellant still wishes to seek one. (See *Vinson, supra*, 93 Cal.App.5th at p. 1180.) Appellant's request that a different judge be assigned to the matter on remand is granted. Appellant is entitled to her costs on appeal.

_____

Humes, P.J.


WE CONCUR:



_____

Banke, J.




_____

Getty, J.*







     *Judge of the Superior Court of the County of Solano, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*D.S. v. B.S.*  A167778